572 So.2d 730 (1990)
Larry J. FERNANDEZ
v.
The M/V RIO LIMAY, et al.
No. 90-CA-0044.
Court of Appeal of Louisiana, Fourth Circuit.
December 20, 1990.
Writ Denied February 22, 1991.
*731 Harry E. Forst, New Orleans, for plaintiff/ appellant.
Terriberry, Carroll & Yancey, John A. Bolles, New Orleans, for defendants/appellants.
Before SCHOTT, C.J., and LOBRANO and PLOTKIN, JJ.

DECREE
PER CURIAM.
As to the two issues concerning the liability of the defendants raised in the appeal of the defendants, this court affirms the trial court on both issues.
As to the three issues raised in the appeal of the plaintiff, this court affirms on the issue of quantum of general damages.
As to the issue of contributory negligence, the judgment of the trial court is reversed insofar as it allocated forty percent of the fault to the plaintiff and sixty percent of the fault to the defendants. This court finds no contributory negligence and that the defendants are one hundred percent at fault. Accordingly the judgment is amended to award plaintiff the entire sum of $39,372, less the amount already awarded to the intervenor.
For the reasons assigned in the concurring opinions of Schott, C.J., and Lobrano, J., the failure to make an award for future loss of earning capacity is affirmed.
PLOTKIN, J., dissents on this issue with reasons.
SCHOTT, C.J., joined by LOBRANO, J., concurs in the decree.
PLOTKIN, Judge, concurring in part and dissenting in part.
Empresa Lineas Maritimas Argentinas, S.A. (ELMA) is the owner and operator of the vessel M/V RIO LIMAY. ELMA appeals a judgment rendered in favor of a longshore worker, Larry J. Fernandez, who slipped and fell on slime aboard the vessel while engaged in unloading operations. ELMA contends on appeal that the shipowner is not liable for conditions which are *732 open and obvious and that it is entitled to rely on the stevedore to insure the safety of unloading operations and to protect its employees from injury. The plaintiff, Fernandez, appeals the trial court's finding that he was forty percent comparatively negligent and the quantum of damages awarded.

THE FACTS:
On September 8, 1986, at 8 a.m., Larry Fernandez boarded the M/V RIO LIMAY for the first time. Fernandez was a longshore worker employed by Transocean Terminal Operators (TTO), a stevedoring company which was to unload the RIO LIMAY, a vessel owned and operated by ELMA.
Fernandez boarded the vessel by way of a ten-foot gangway which extended from the wharf to the bulwark. A three-step portable ladder descended from the bulwark to the deck. At the bottom of the ladder, it was necessary to make a sharp right turn to go to the hatch area which was being unloaded. There was a puddle of water directly below the ladder and in the way when the longshore workers came off the ladder and made the right turn. The worker in front of Fernandez stepped in the puddle and proceeded on. Fernandez stepped in the puddle and fell down, falling on and injuring his lower back.
The puddle was caused by water coming from a drainpipe located near the foot of the ladder. The water actually came into the drainpipe from a leak in a makeshift swimming pool on the upper deck. Under this wet area, slime and algae had accumulated which created a slippery and hazardous condition.
Fernandez tried, but was unable, to continue working. He reported the accident two or three hours later. At that time the safety director of TTO, Steven Downs, sent Fernandez to a doctor and made photographs of the accident area. In his investigation, Downs noted the source of the water and that he had noticed the condition on prior visits of the vessel in port. On these prior occasions he had told the duty officer of the vessel to correct the condition. He also noticed on the date of the accident that there were rags and rope tied around the leaking valve of the swimming pool in an attempt to stop the leakage. He testified that the slipperiness of the puddle was not caused by the water, but by the slime under the water which had built up over an extended period.
Fernandez was in treatment for his back injury for about 18 months. He has been unable to do heavy longshore work since the time of his injury, although he has worked at several other, lower-paying, jobs.
The trial court found the vessel negligent in allowing the slimy film to accumulate on the deck. However, it apportioned the fault sixty percent to the vessel, and forty percent to Fernandez, who, it found, noticed the water and failed to exercise reasonable care under the circumstances. The court awarded the plaintiff $15,000 in general damages, $4,445 in medical expenses, and $19,926 in past lost wages. It awarded nothing for future lost earnings. The compensation insurer for TTO, Signal Mutual Insurance Association, intervened for the $33,745 it had paid in benefits. The court ordered this claim to be paid out of the judgment.

THE APPEAL OF ELMA

ISSUE 1: THE NEGLIGENCE OF THE VESSEL
a. Whether the Hazard Was "Open and Obvious"
The trial court found that the vessel was negligent and therefore liable to the longshore worker under the Longshore and Harbor Workers' Compensation Act (LHWCA), Section 5(b). Before the 1972 amendments to the LHWCA, a vessel could be held strictly liable for injuries to longshore workers on the basis of a finding of "unseaworthiness" of the vessel. The 1972 amendments to the LHWCA limited the liability of the vessel owner to situations where the vessel or its crew is proven to have been negligent. Under the LHWCA the remedy in Section 5(b) is exclusive of all other remedies against the vessel.
The duties of the vessel owner to the longshore worker under Section 5(b) were defined by the Supreme Court in Scindia *733 Steam Nav. Co. Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Affirming its decision in Marine Terminals v. Burnside Shipping Co., 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), the Supreme Court held that:
the vessel owes to the stevedore and his longshore ... employees the duty of exercising due care `under the circumstances.' This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.... The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools and work space to be used in the stevedoring operations; and if he fails to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshore [worker].
Scindia, 451 U.S. at 166-67, 101 S.Ct. at 1622.
Under Scindia the vessel owner has a duty to remedy and to warn longshore workers of defects which are known. The Fifth Circuit has held that this "duty is not breached if the defect causing the injury was open and obvious and one that the longshore [workers] should have seen. An obvious defect should be as apparent to the stevedore and its longshore [ ...] employees as to the shipowner." Polizzi v. M/V ZEPHYROS II MONROVIA, 860 F.2d 147, 149 (5th Cir.1988).
The Fifth Circuit in 1983 articulated a two part test.
Once loading operations have begun, the vessel owner can be held liable for injuries to employees of the stevedore resulting from open and obvious dangers only in the event of actual knowledge of the danger and actual knowledge that he cannot rely on the stevedore to remedy the situation.
Helaire v. Mobil Oil Co., 709 F.2d 1031, 1038-39 (5th Cir.1983). The vessel owner can be held liable only if the fact of its actual knowledge of these two factors is undisputed. Id.
More recently, however, the Fifth Circuit narrowed this exception when the hazard is under the control of the vessel. "Thus, neither the Supreme Court nor this court has intimated that a vessel will be relieved of its duty of care under [Section] 905(b) simply because the hazard is open and obvious." Masinter v. Tenneco Oil Co., 867 F.2d 892, 897 (5th Cir.1989).
The Fifth Circuit now holds that "the shipowner has no defense that the hazard was ... open and obvious." Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 167 (5th Cir.1990).
The hazard in this case was not "open and obvious." Fernandez and his co-worker testified that they saw a puddle of water on the deck. Water in its natural state, such as rain or sea water, is an expected and normal condition. When such water is found on the deck of a vessel, it is open and obvious, but it is not a hazard which could cause injury to workers since the surface of decks are generally rough and drains are strategically located on vessels to eliminate the build-up of water. Downs, the safety director of TTO, testified that it was not the water that was slippery, that is, the hazard, but rather the slime under the water. There is no evidence that the real hazard, the slime, was open and obvious. Thus the trial court was correct in not finding the hazard to be "open and obvious." The slime was not an open and obvious defect which was apparent to the longshore worker.
*734 b. The Legal Standard for Negligence of the Vessel
Under Scindia, the vessel owner has two duties to the longshore worker:
(1) to exercise ordinary care to have the ship in a safe condition, and
(2) to warn the stevedore of any hidden dangers of which the vessel is aware.
In this case the vessel failed to exercise due care to remedy the leaking swimming pool. It also failed to warn the stevedore of a hidden danger of slime accumulation in the water of which it should have been aware.
A recent Fifth Circuit case provides a test specifically for slip and fall cases. To establish the negligence of the vessel, the plaintiff must prove (1) the vessel put the foreign substance on the deck or knew that it was there, and willfully or negligently failed to remove it, or (2) the foreign substance had been on the deck for a long period of time so that it should have been discovered and removed by the vessel crew in the exercise of reasonable care. Treadaway, 894 F.2d at 166.
The evidence shows that the vessel created the hazard and negligently failed to remove it. The record also shows that the condition had been present over a long period of time. The evidence satisfies the test enunciated in Treadaway and confirms the finding of the trial court that the vessel was negligent.
The question of negligence in maritime cases is factual. It should not be disturbed on appeal unless the finding of the trial court was clearly erroneous. Masinter, 867 F.2d at 898. This court affirms the finding of the trial court that the vessel M/V RIO LIMAY was negligent.

ISSUE 2: RELIANCE ON THE STEVEDORE
Under Scindia, the vessel owner is entitled to "rely on the thesis that the stevedore is an `expert and experienced' and will act with `reasonable care.' The shipowner has no duty to anticipate the action or inaction of a careless stevedore." Polizzi, 860 F.2d at 149. This must, however, be read in conjunction with the duties of the vessel owner under Scindia to turn over the vessel to the stevedore in safe condition and to warn the stevedore of any hazards which are known or should be known by the vessel.
In passing the 1972 amendments, congress specifically stated that `nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.' 1972 House Report at 4704.
Walker v. Blacksea S.S. Co., 637 F.2d 287, 292 (5th Cir.1981).
ELMA contends that the stevedore, TTO, had knowledge of the hazardous condition and was negligent in not correcting it. Once the negligence of the vessel owner is established, whether the stevedore was also negligent is irrelevant to the issue of the injured longshore worker's recovery against the vessel owner. Walker, 637 F.2d at 293. After the 1972 amendments to Section 905(b), the rule remains that a longshore worker who is injured through the concurrent negligence of the stevedore and the vessel can recover the entire amount from the vessel. Walker, 637 F.2d at 293.
The Fifth Circuit has held that "considerations of the stevedore's awareness of and degree of control over a dangerous situation are irrelevant when the existence of the dangerous condition is attributable to the negligence of the shipowner." Lemon v. Bank Lines, Ltd., 656 F.2d 110, 116 (5th Cir., 1981).
The Supreme Court has clearly established that the ability of a longshore [worker] to recover cannot turn on who was in the best position to recognize and remedy a dangerous condition when the condition was created by a vessel owner who knew or should have known of its existence prior to the stevedore's operations.
Morris v. Compagnie Maritime des Chargeurs Reunis, S.A., 832 F.2d 67, 70 (5th Cir.1987), cert. denied 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988), citing Lemon, 656 F.2d at 116.
*735 Even if TTO had prior knowledge of the existence of the hazardous condition and could have corrected the condition, the trial court was correct in not ruling on the possible negligence of TTO, since the negligence of the stevedore is not legally relevant to the liability of a vessel owner to an injured longshore worker when the negligence of the vessel has been established.

THE APPEAL OF FERNANDEZ

ISSUE 3: THE CONTRIBUTORY NEGLIGENCE OF FERNANDEZ
The trial court found Fernandez forty percent at fault in causing his injury. The court's basis for finding comparative negligence was that Fernandez had noticed the water on the deck before stepping into it. This was construed as a failure to exercise due care. The plaintiff should have known that "wet floors are more slippery than dry floors." However, the court also found that the wet area of the deck was slippery due to the slimy film, as opposed to mere water.
Fernandez admitted that he saw water on the deck, but also stated that he could not avoid stepping into it. He also testified that he did not know how long the water had been there and that he had no reason to believe that it would be slippery. He had walked through water on ships before where it was not slippery and he had not fallen.
Three witnesses, Downs, Britton, and Fernandez, testified that there was no way in which Fernandez could have avoided stepping in the puddle at the foot of the ladder. Two of these witnesses indicated that the puddle had been considerably larger at the time of the accident than it appeared in the photographs taken by Downs several hours later. Each of these witnesses marked the photographs as to the actual size of the puddle at the time of the accident. The marked photographs clearly show that it was not possible to avoid walking through the puddle.
Since the question of negligence is factual, it will only be disturbed on appellate review when the finding is clearly erroneous. Masinter, 867 F.2d at 898.
The question is whether, in the light of the legal negligence of the vessel, Fernandez could also be found at fault. The evidence is clear that Fernandez could not avoid stepping in the puddle and that, although he knew that water was present, he had no reason to know that there was a slimy film under the water. The cause of the fall was not the water on the deck but the slipperiness created by the slime under the water.
On the basis of its own finding that Fernandez had knowledge of the presence of water, but not not of slime, on the deck, the trial court was clearly erroneous in holding that Fernandez was forty percent at fault. Under the facts in evidence and the law of the comparative negligence of a longshore worker, we reverse the trial court on this issue and hold that Fernandez was not negligent in causing his own injuries.

ISSUE 4: QUANTUM OF GENERAL DAMAGES
The trial court found that Fernandez' injury was a chronic lumbar strain, part of which was due to a prior injury in 1985. The trial court awarded $15,000 in general damages.
Fernandez testified that the 1986 injury caused him to lose his house, his car, his credit, and his longshore job which he had held for 26 years. In addition, he lost the pleasures of playing baseball and riding horses.
A review of recent cases shows an award of $15,000 in general damages, excluding future lost earnings, for a chronic lumbar strain alone, without a fracture or disc problem or surgery, is well within the range of awards for similar injuries.
The award for general damages is a factual finding of the trial court and should not be disturbed when the amount of the award is not clearly erroneous. Masinter, 867 F.2d at 898.

ISSUE 5: FUTURE LOST EARNINGS
On this issue, the majority, in its concurring opinion, affirms the trial court. I, however, dissent from their opinion and would reverse the trial court on this issue.
*736 The trial court declined to award any specific amount of damages for the loss of future earnings, stating that it had incorporated the amount of possible lost future earnings within its award for general damages and that any such loss would be the result of chronic pain caused by both accidents.
Fernandez contends that he will lose future earning capacity because he is unable to perform the extremely heavy duties of longshore work. He is, however, able to perform light and limited manual labor. Since the 1986 accident Fernandez has not done longshore work, but has done several short term light duty jobs.
Under federal maritime law, the general principle in determining loss of earning capacity after an injury is to place the plaintiff in the same economic position that he or she would have been in but for the occurrence of the accident. Wright v. Ocean Drilling & Exploration Co., 444 So.2d 129, 135 (La.App. 4 Cir.1983), writ dismissed 445 So.2d 431-32 (La.1984). The facts show that Fernandez was doing heavy and unrestricted longshore work at the time of the 1986 accident. But for his slip and fall, he would have been able to continue doing all types of longshore work.
In order to recover for lost earning capacity, a plaintiff must prove by the preponderance of the evidence that he or she is entitled to such an award. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). The factors which the plaintiff must prove are the extent of the injury and that the injury has incapacitated the plaintiff from doing work of a similar kind in the future, work for which he or she is fitted by training and experience. Id. 216 So.2d at 822.
Fernandez' injury was diagnosed as a chronic lumbar strain. Fernandez' treating orthopedist and his physical therapist from the "Back to Action" rehabilitation center at Touro both testified that Fernandez would never in the future be able to do unrestricted heavy longshore work. Dr. Murphy, the treating physician, testified that he had advised Fernandez not to return to heavy longshore work and that the rehabilitation program was only able to strengthen Fernandez to the point of being able to do medium heavy work, not the very heavy type of work frequently required of longshore workers. Dr. Murphy declined to find permanent disability. However, he testified that after the 1986 accident, he ordered Fernandez on a permanent basis not to return to heavy longshore work.
Two orthopedists hired by the defense, one of whom saw Fernandez once, the other twice, both testified that Fernandez had no future disability and should be able to do longshore work. Thus, although the doctors agreed as to future disability, they disagreed as to whether Fernandez would, in the future, be able to do heavy longshore work. Dr. Murphy and the report of the Touro rehabilitation program both demonstrated that Fernandez would not be able to do heavy longshore work. Great weight is given to the testimony of the treating physician. "Louisiana courts have consistently held that the testimony of the physician who examines and treats a person from the inception of his [or her] injury is entitled to greater weight than the opinion of one who only examines the person later." McLaughlin v. Schwegmann Supermarkets, 567 So.2d 165, 168 (La.App. 4 Cir.1990). The testimony of the treating physician is entitled to greater weight than that of a doctor who examines the patient only once or twice in preparation for litigation. Id. Similarly the testimony of a treating physician should be given greater weight than that of a physician who merely examines a patient. Celestine v. U.S. Fidelity & Guar. Co., 561 So.2d 986, 990-91 (La.App. 4 Cir.1990). Moreover, Fernandez had not, in fact, been able to do longshore work during the two years and eight months between the time of the accident and the time of the trial.
This court has enumerated specific points which must be proved to justify an award for future lost earnings: expert economic testimony, the physical condition of the plaintiff before the accident, the amount earned in previous years, and the probability of earning similar wages in future years. Harris v. Tenneco Oil Co., 563 *737 So.2d 317, 323 (La.App. 4 Cir.), writ denied 568 So.2d 1062 (La.1990).
In a recent case, this court has found sufficient basis for an award of lost future income. The decision of the court of appeal was based upon a review of the record and specifically of the following evidence: the testimony of the treating physician that the plaintiff could not return to the same type of work which involved lifting heavy objects, his feeling that the injury was permanent, and records which verified the plaintiff's earnings for the past six years. Groves v. Illinois Cent. Gulf R. Co., 563 So.2d 496, 501 (La.App. 4 Cir.), writ denied 568 So.2d 1083 (La.1990). In that case the defense presented an orthopedic expert who testified that the injury was minor and not caused by the accident. The defense also noted that the plaintiff did not present any expert economic testimony to substantiate future earnings. Id.
In another case, the court of appeal overturned the trial court's failure to make an award to loss of earning capacity in a case where the plaintiff, a nurse, was able to return to some areas of nursing, but not to others. Henry v. National Union Fire Ins. Co., 542 So.2d 102 (La.App. 1 Cir.), writ denied 544 So.2d 405 (La.1989). In order to advance to the position of head nurse, it was necessary for her to work in all areas of nursing. Id. at 106-07.
The Louisiana Supreme Court recently reviewed the law on loss of earning capacity. In Hobgood v. Aucoin, 569 So.2d 542 (La.1990), the plaintiff suffered cervical and lumbar strains, which impaired his ability to work to his full capacity. The only restriction placed on Hobgood's activities by his treating physician was to "avoid activities that tended to make his condition worse and to use common sense." 569 So.2d at 544. The plaintiff owned and operated a company which provided services to oil rigs. Despite the recession in the oil industry, in the years following plaintiff's accident, the company continued to make a profit. Plaintiff contended that the company's profits would have been greater had plaintiff been able to work to his full capacity. The court of appeal agreed on remand and awarded plaintiff $50,000. Hobgood v. Aucoin, 558 So.2d 1285 (La.App. 1 Cir. 1990). The Supreme Court affirmed, holding that "plaintiff's inability to pursue his business as vigorously and energetically as he did prior to injury shows that his ability to earn has been impaired." 569 So.2d at 546. The court admitted that the loss of earning capacity was highly speculative as to value or amount and made the award based upon the economic impact of the plaintiff's restricted activity on his earning capacity.
In the instant case, the plaintiff's treating physician, Dr. Murphy, concluded that after the 1986 accident Fernandez would be permanently restricted from heavy longshore work. He testified that Fernandez' present condition did not prevent him from doing light to moderate longshore work, but did prohibit heavy longshore work on a permanent basis. Fernandez' condition after his previous accident in 1985 did not prevent him from returning to heavy longshore work after he was discharged by Dr. Murphy.
Fernandez is entitled to the rebuttable presumption that his present condition and permanent restriction from heavy longshore work were caused by the 1986 accident.
The law recognizes that a medical condition producing disability is presumed to have resulted from an accident if before the accident the injured person was in good health but shortly after the accident the disability causing condition manifested itself, provided there is a reasonable possibility of a causal connection between the accident and the condition.
American Motorists Insurance Co. v. American Rent-All, Inc., 566 So.2d 121 (La.App. 5 Cir.1990).
Evidence was introduced as to Fernandez' past earnings as a longshore worker and his earnings in the limited non-longshore employment he had had since the accident. An economics expert testified as to the reduction in his future earning capacity. He estimated that this reduction would amount to $159,173 if Fernandez *738 were able to work regularly at minimum wage.
The trial court made no ruling as to the material fact whether Fernandez was presently or would in the future be physically able to do any or some types of longshore work. Nor did the court make any finding as to what effect such a change in employment could have on the plaintiff's future earning capacity.
A court of appeal may not set aside the findings of a trial court absent manifest error or unless such finding is clearly erroneous. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, in this case the trial court failed to make a finding as to two important issues of material fact. It was precisely this failure to make a factual finding which was clearly erroneous. Upon review of the record, I would find that the preponderance of the evidence supports the inability of the plaintiff to continue to do heavy longshore work, and, that consequently, he will suffer a loss in his future earning capacity.
The preponderance of the evidence in the record shows that the plaintiff will be permanently unable to do heavy longshore work, but that he should be physically able to do light to moderate duty longshore work. Fernandez is able to earn $14 to $17 per hour doing longshore work. This is considerably more than the minimum wage used by the economist to calculate the loss in earning capacity. The record also shows that longshore work is predominantly heavy work, although it is possible at times to find light to moderate duties. There will, thus, be some loss in income because Fernandez will presumably not be able to find light to moderate longshore work on a full-time basis during his remaining work years.
For the above reasons, I would find the failure of the trial court to award lost future earnings to be clearly erroneous. When the trial court has denied making an award for loss of earning capacity, the court of appeal may do so on review of the record. Hobgood v. Aucoin, 558 So.2d 1285 (La.App. 1 Cir.1990), aff'd 569 So.2d 542 (La.1990). It is reasonable to conclude that the plaintiff could have earned more money if able to do unrestricted and heavy longshore work. The "loss of earning capacity, although proved in a general sense, is highly speculative as to value or amount." 569 So.2d at 547. Since the impairment of earning capacity cannot be calculated with mathematical certainty, sound judicial discretion must be exercised after all considerations have been weighed. Philippe v. Browning Arms Co., 395 So.2d 310, 317 (La.1980). After weighing all proper considerations, I believe that the court of appeal could exercise its discretion and fix plaintiff's loss of earning capacity at $25,000.
For the foregoing reasons, I respectfully dissent from the majority on the issue of future lost earning capacity. I join the majority on all other issues.
SCHOTT, Chief Judge, joined by LOBRANO, J., concurring in the decree:
We subscribe to all of the reasons assigned by Plotkin, J., with respect to liability and quantum except with regard to his treatment of the issue of future lost earnings. As to this issue we are unable to conclude that the trial court committed manifest error by declining to award a specific amount for this item.
In every case relied upon by Judge Plotkin, the plaintiff established that his disability, upon which his claim for loss of earning capacity was based, was caused by the accident sued on. In the present case plaintiff failed to prove causation. His own treating physician, and the only medical witness to testify, Dr. Murphy, stated that prior to the accident of September, 1986, the one sued on, plaintiff's back condition was such that he should not have been doing heavy work before the accident. Dr. Murphy testified that by January, 1987, plaintiff's condition was the same as it was in April, 1986. This obviously means that whatever loss of earning capacity he was claiming after January, 1987 was not caused by the accident of September, 1986, because his disability was exactly the same as it was in April, five months before the accident.
*739 We are unable to find that the evidence preponderates in favor of plaintiff on this issue of causation because the only testimony supporting plaintiff's case is his own. The trial court evaluated this testimony in the light of Dr. Murphy's and clearly rejected it.
Accordingly, we concur fully in the decree.