SCHOTT, Chief Judge.
This is a suit for personal injuries sustained by plaintiff when he was performing dockside repairs on a ship owned by defendant, Lykes Brothers Steamship Company, Inc. The claim was made under the Long-shore and Harbor Workers’ Compensation Act (LHWCA) 33 U.S.C. § 905(b). The trial court dismissed the claim of plaintiff and his employer’s insurer, Aetna Casualty & Surety, which intervened to recover benefits it paid plaintiff. The central issue on appeal is whether the trial court judgment finding no negligence on the part of defendant is clearly wrong.
Plaintiff was employed as a pipefitter by Dixie Welding and Metal Works. Dixie entered into a contract with defendant, Lykes, to perform various services aboard the Almería Lykes in preparation for her sale to the United States Government and her entry into the “mothball fleet”. Dixie commenced its work on May 21, 1986, and was practically finished on July 24 when the accident occurred.
Plaintiff was instructed to replace a valve in the hydraulic system which operated the stern gate of the ship. The valve was located in the middle of the gate about twenty feet from the upper deck. Because of the valve’s location, plaintiff’s foreman decided to place plaintiff inside a personnel basket which would be hooked to and lowered by the ship’s stores crane to the place where the valve was located on the wall. When this decision was made, the crane was being operated by a Dixie employee and was being used to remove scaffolding from the lower deck of the ship onto the wharf.
Plaintiff rigged the basket to the hook of the crane, he got inside, and the crane lowered him to the area of the valve. When plaintiff discovered that he could not get close enough to the wall to do the job, he called to a co-employee on the upper deck to signal the crane operator to return the basket to the deck. When the basket was about even with the deck, the cable of the crane broke and the basket with plaintiff inside fell almost fifty feet to the deck below.
The evidence clearly establishes two contributing causes for the accident. First, the cable of the crane was defective, and second, the operator of the crane was negligent when he allowed it to be “two blocked” immediately before the cable broke.
*22 As to the first cause, the cable snapped just above the swage fitting. This is a part located just above a thimble which was joined by a shackle to a headache ball. The hook of the crane was located below the headache ball. A diagram of this configuration is made part of this opinion. The swage fitting is a clamp which is applied to the cable under pressure to lock it in place.
After the accident, the broken cable was microscopically examined by a metallurgist, Dr. Courtney Busch, who ascertained that sixty-five percent of the small wires making up the cable were rusted or corroded inside and just above the swage fitting with the result that the cable had lost sixty-five percent of its strength. He thought it took one and one-half years for this amount of deterioration to develop. The crane was originally designed to lift 33,400 pounds, but Dr. Busch, by counting the number of small wires whose broken ends where shiny indicating that they were not corroded, estimated that the capacity of the crane prior to the accident was 14,000 pounds.
The other contributing cause of the accident was that the crane was “two blocked”. Two blocking occurs when the operator of the crane, while lifting a load, allows the headache ball and the other components to slam into the boom of the crane. The momentum generated by the movement and weight of the load and the shock of the impact on the boom substantially increases the stress and tension on the cable.
Plaintiff produced some of his co-workers, including the crane operator, who denied that two blocking had occurred, but experts, Dr. Busch and Robert Babcock, were both of the opinion that two blocking had occurred. These opinions and the testimony of defendant’s lay witnesses who saw the accident clearly support the trial court’s conclusion that the two blocking occurred.
The trial judge gave the following reasons for judgment:
The vessel was being repaired by Dixie Machine Welding and Metal Works, Inc., the employer of the plaintiff. Repairs started on May 21,1986, and the accident took place on July 24, 1986. The plaintiff was injured when a cable on the ship’s stores crane parted. Plaintiff was being lowered in a personnel basket and fell to the deck suffering serious injuries. The trial took place only on the issue of liability. The only defective part of the cable was within the swage fitting on the end of the cable. The cable broke within the swage fitting. This deteriorated because of rust prior to the ship being turned over to Dixie for repairs. The defect in the cable was not ascertainable by visual inspection. The ship was being repaired by Dixie to be sold to the U.S. Maritime Administration for use in the U.S. Ready Reserve Fleet. The ship was transferred on the day of the accident, several hours after the accident. All work was supervised by Dixie, and defendants did not supervise or actively become involved in the work. On May 21, 1986 the stores crane was inspected by an independent surveyor of the American Bureau of Shipping. The crane was inspected by inspectors for the U.S. Maritime Administration. The crane was not used by the defendant between the time of these inspection and the time of the accident. The evidence shows that the crane was two blocked, while being operated by a Dixie employee. A non defective cable should lift 33,000 pounds. The capacity of a ship’s stores crane is 3,125 tons. The personnel basket with the plaintiff inside weighed approximately 750 lbs. In the May 1986 test, the crane lifted 3.9 tons with this cable. Some 65% of the wires in the cable, inside the swage were broken, or rusted through prior to the May 1986 work commencement by Dixie. It was calculated by the plaintiffs’ expert that with these wires rusted through, the cable should have been able to lift between 9,800 lbs, and 14,000 lbs. Under these facts, the Court finds the plaintiff has failed to show negligence on the defendant.
There is no dispute about the law applicable to this case. The leading case on LHWCA liability of a vessel owner to a shore worker injured on the ship is Scindia *23 Steam Navigation Co. v. de los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Under this case, the vessel owner has the duty to exercise ordinary care to have the ship and its equipment in such condition that the worker in the exercise of reasonable care may perform his duties with reasonable safety. The vessel owner has the corresponding duty to warn the shore worker of any hazardous conditions on the ship which are known or which should be known by the owner in the exercise of reasonable care. Morris v. Compagnie Maritime des Chargeurs Reunis, S.A., 832 F.2d 67 (5th Cir.1987). This duty apparently governs the vessel’s conduct before stevedoring operations have begun. Woods v. Sammisa Co., Ltd., 873 F.2d 842, 847 (5th Cir.1989), cert. denied 110 S.Ct. 853, 107 L.Ed.2d 847 (1990). In the present case, as in Woods, the defect or hazardous condition was present in the vessel before Dixie’s work began. An owner cannot be held liable to a shore worker where the accident is caused solely by the worker’s employer or fellow employees. Briley v. Charente Steamship Company, Limited, 572 F.2d 498 (5th Cir.1978). Any negligence on the part of the ship owner causing injury to the shore worker makes the owner liable to the worker irrespective of concurrent negligence on the part of the worker’s fellow employees and the owner is allowed no credit for that concurrent negligence. The owner is allowed a credit for the contributory negligence of the shore worker. Edmonds v. Compagnie Generate Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979). On appeal, the finding by the trial court of no negligence on the part of the ship owner will not be disturbed unless the record shows that such finding is clearly wrong. Masinter v. Tenneco Oil Co., 867 F.2d 892 (5th Cir.1989); Fernandez v. M/V Rio Limay, 572 So.2d 730 (La.App. 4th Cir.1990), writ denied 575 So.2d 397 (La.1991).
As we interpret the reasons for judgment, the trial court found that the cable’s corrosion was a cause of the accident; and this finding is amply supported by Dr. Bush who stated that had the cable not been sixty-five percent corroded it would have withstood the pressure from two blocking and would not have snapped.
But the crucial factual determination by the trial judge in this case is, “The defect in the cable was not ascertainable by visual inspection.” This finding is manifestly erroneous and requires a reversal of the judgment.
Defendant called Captain Julian T. Pla-ton as its witness. He had been the first mate on the Almería Lykes. He was responsible for regular inspections of the crane and its parts and testified on direct examination that the cable was constantly checked and greased to prevent rusting. After stating that he knew of no way to check for deterioration of the cable inside the swage fitting, he was confronted with the following testimony he had given in a deposition taken a few months before trial:
Q. So I am asking you as chief mate, are you aware of any procedures or standard procedures, maintenance procedures that are performed routinely on the ends of wires where they enter swage fittings to prevent the failure of those wires, especially in situations where you can’t examine the interior of the wire?
A. Certainly there are procedures.
Q. What are they?
A. Again, we go back to the inspections. During the inspections I personally inspect swage fittings, and I learned this on conventional ships where we had standing pieces of wire which the name escapes me — preventers. At the point where the wire enters the swage fitting, using a knife, if you pry as far as you can and you find any rust or an ability to probe a knife or pointed object further, you can assume there is some deterioration there. During the inspection, this is what I do. Also as preventive measure, we use grease, and that area in particular is kept packed with grease to try and prevent it from deterioration.
After acknowledging that he had made this statement, the following colloquy ensued between plaintiff’s attorney and Captain Platon:
*24 Q. In performing this test with your knife on wire or cable when it enters the swage fitting, if that wire that you were probing and testing had been corroded through, and in the swage fitting or right at the very top of the cable was a number of wires had been corroded through, you’d expect that wire to break loose, wouldn’t you?
A. If they were corroded, yes, sir, they would give way.
Q. Thank you. And if the wires were in a deteriorated state—
MR. ALLEN:
May I ask counsel to back up away from the witness and the confrontation. You’re making him nervous with the answer, and I don’t want him to feel that counsel is overbearing.
BY MR. BISHOP:
Q. If the wires were in a deteriorated state, what would you do with the cable?
A. If I found wires in a deteriorated state, an excessive number of wires, we would replace the cable.
From the testimony by defendant’s witness, the conclusion is inescapable that if Platon had discharged the very duty he said was his to pry the wires above the swage fitting, he would have known about the deterioration. This readily leads to the further conclusion that he should have known about the defect in the exercise of reasonable care. The discovery of such rampant corrosion would have led to a replacement of the cable with one capable of lifting 33,400 pounds, and the accident would not have occurred even with the negligent two blocking on the part of the crane operator, plaintiff’s fellow employee. Considering Captain Platon’s testimony, defendant’s argument that it could rely entirely on the load test successfully performed in May 1986 has no merit.
Accordingly, the judgment appealed from is reversed and set aside, and there is judgment in favor of plaintiff and intervenor and against defendant on the issue of liability and for all costs of these proceedings. The case is remanded to the trial court for further proceedings.
REVERSED AND REMANDED.
*25 APPENDIX
[[Image here]]