| iBAGNERIS, Judge.
This maritime .suit was brought by Theodore Holmes against Daybrook Fisheries, Inc. for injuries he sustained from a fall on a fishing vessel, owned and operated by defendant. After a non-jury trial, the trial court rendered judgment for plaintiff finding that defendant breached its duty to provide plaintiff a safe place to work. The court awarded plaintiff $449,196.32 in total damages; in addition, the court awarded plaintiffs wife $25,-000.00 for loss of consortium.
Daybrook Fisheries, Inc. appeals and assigns the following errors:
I. The trial court erred in holding that Daybrook as vessel owner was liable to the plaintiff under 33 U.S.C. § 905(b), as none of the allegations of 905(b) vessel owner negligence raised by the plaintiff involved vessel owner’s dúties set forth in the statute and jurisprudence interpreting it.
II. The trial court committed manifest eiTor in holding that the plaintiffs comparative fault was only fifteen percent under the undisputed facts of this case.
III. The trial court erred in its judgment in failing to credit Daybrook for the LHWCA benefits provided to the plaintiff by Daybrook.
Because we find merit in defendant’s first assignment of error, we find it unnecessary to review defendant’s remaining assignments. We disagree with the trial court’s finding that defendant breached its duty to provide plaintiff with a safe place to work; therefore, we reverse.
*1008 REACTS
Plaintiff was employed by defendant, Day-brook Fisheries, Ine. (Daybrook) as a menhaden (hereinafter “pogy”) bailer on the F/V MARIA C, which was owned and operated by Daybrook. On April 19,1994, around 7:30 PM, after the vessel arrived dockside, plaintiff boarded the vessel, removed the hatch covers, and descended a ladder 30’ into the hold of the vessel to begin unloading the fish. Plaintiff clamped his safety line and signaled to the hole-spotter atop to turn on the water. Plaintiff began to wash the pogy towards the trough of the hold, which was shaped in a deep “V”, with a high powered hose, similar to that of a fireman’s hose. At the bottom of the trough was a high-powered suction hose that would transport the fish from the vessel to the fish processing plant. As plaintiff neared the end of this process, he proceeded to ascend the incline of the hold and lost his footing, falling on his shoulder. Plaintiff continued to grasp the hose, which by its force threw plaintiff against the steel bulkhead causing him to hit his head.
Plaintiff incurred injuries as a result of the fall and brought suit against Daybrook alleging that Daybrook was liable to him under the Jones Act or in the alternative under the Longshoreman and Harbor Workers’ Compensation Act (LHWCA). Prior to trial the parties stipulated that plaintiffs claim was based on the LHWCA. Since his injury, plaintiff has received workmen’s compensation from Daybrook as his employer, but in the instant suit he seeks negligence damages from Daybrook as the owner of the vessel. STANDARD OF REVIEW
Admiralty claims may be brought in federal court pursuant to its admiralty jurisdiction or in state court under the savings to suitors clause; in either case, j3federal substantive maritime law applies. Antill v. Public Grain Elevator of New Orleans, Inc., 577 So.2d 1039 (La.App. 4 Cir. 1991), writ denied, 581 So.2d 684 (La.1991). In an admiralty case, the appellate court reviews the district court’s findings of fact for clear error and considers all questions of law de novo. Randall v. Chevron, U.S.A., Inc., 13 F.3d 888 (5 Cir.1994), mod. on other grounds on rehr’g, 22 F.3d 568 (5 Cir.1994), cert. dismissed, Sea Savage, Inc. v. Chevron, U.S.A., Inc., 512 U.S. 1265, 115 S.Ct. 5, 129 L.Ed.2d 906 (1994).
The parties disagree as to what standard of review applies; however, this court finds that regardless of which standard we apply the trial court’s decision is contrary to the law.
DISCUSSION
Prior to 1972, the law allowed an injured longshoreman to recover workmen’s compensation from his employer and bring suit against a ship-owner for unseaworthiness or negligence. However, the 1972 amendments to the LHWCA, which created 33 U.S.C. § 905(b), abolished the longshoreman’s right to bring an unseaworthiness claim against a vessel owner, but preserved his right to bring a negligence claim. The purpose of this statute was to place the longshoreman “in the same position he would have been if he were injured in non-maritime employment ashore.” S.Rep.No.92-1125, p. 10 (1972). Thus, the only cause of action an injured longshoreman may maintain against the vessel owner is for negligence in maritime tort, not for unseaworthiness.
In Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) the Supreme Court considered the extent of the duty owed to a longshoreman by the vessel owner. The Court concluded that under § 905(b) a vessel owner owes a duty to a longshoreman under limited circumstances:
|41. The Turnover Duty
Prior to turning over the vessel a shipowner must “exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known ...” Id. at 167, 101 S.Ct. at 1622, 68 L.Ed.2d 1.
2. The Active Control Duty
*1009 Once the vessel is turned over and stevedore operations begin, the owner may rely on the stevedore to discharge his duties in a workmanlike manner, avoiding exposing longshoreman to unreasonable hazards. Id. at 170, 101 S.Ct. at 1624, 68 L.Ed.2d 1. Under this duty, absent contract provision, positive law, or custom to the contrary, “the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.” Id. at 172, 101 S.Ct. at 1624, 68 L.Ed.2d 1.

3. The Intervention Duty

The shipowner may have a duty to intervene in cargo operations when it becomes aware of a dangerous condition and the stevedore’s continued operations are so “obviously improvident” as to “present an unreasonable risk of harm to the longshoreman.” Id. at 175-176, 101 S.Ct. at 1626-27, 68 L.Ed.2d 1.
In Castorina v. Lykes Bros. S.S. Co., Inc., 758 F.2d 1025 (5 Cir.1985), cert. denied, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985) the United States Fifth Circuit Court of Appeal declined to impose a greater duty of care on a ship-owner when that owner is also the stevedore. Id. at 1032. However, the law remains constant that an injured longshoreman may recover from a vessel owner for negligence, even though the owner is also the employer. (See, Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) for detailed discussion of longshoreman’s right to bring a § 905(b) claim against an owner when owner wears “two hats.”)
Despite this, an injured longshoreman may not assert an unseaworthiness claim by disguising it as a claim for negligence. To allow such an action would, in Rthis court’s opinion, thwart the purpose of the 1972 amendments. Thus, in reviewing the trial court’s decision we are guided by these principles.
Daybrook contends that the four components the trial court cited as the cause-in-fact of plaintiffs injuries either relate to unseaworthiness claims or to stevedore negligence for which Daybrook, as vessel owner, can not be held liable under a § 905(b) analysis. We agree.
In its reasons for judgment, the trial court found that Daybrook breached its duty to provide plaintiff a safe place to work because “the combination of the steep floor, the insufficient lighting, the slippery water being recirculated in the hold and the inadequate safety equipment were the cause-in-fact of plaintiffs injuries.” In reviewing these reasons we find that the judge failed to distinguish between Daybrook as the vessel owner and Daybrook as the stevedore, and as a result placed a higher duty on Daybrook as the owner, in contravention of Castorina.
Statutorily it is the stevedore as the employer that owes the longshoreman a “safe place to work”, which includes inspection of the equipment. 33 U.S.C. § 941; 29 C.F.R. 1918.1; 29 C.F.R. § 1918.51(b). A vessel owner owes only the limited duties to the longshoreman as outlined in Scindia, which do not impose on the owner an absolute duty to provide a safe place to work. Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 166 (5 Cir.1990).
Plaintiff contends that Daybrook breached its turnover and intervention duties because it had knowledge that the hold of the vessel was “steep” and the conditions of the hold were slippery, yet Daybrook failed to remedy the situation. To support this contention plaintiff relies on his testimony that he informed his superiors at safety meetings that conditions on the fishing vessels were slippery. | f;However, actual knowledge of a dangerous condition is insufficient in and of itself to impose § 905(b) liability. Scindia, supra, at 1626.
In addition, plaintiff cites Turner v. Costa Line Cargo Services, Inc., 744 F.2d 505, 507-508 (5 Cir.1984) and Fernandez v. M/V Rio Limay, 572 So.2d 730 (La.App. 4 Cir.1990) to support his assertion that defendant breached the first and third Scindia duties. In Turner a longshoreman sued a vessel owner for injuries he sustained when he fell on an oil slick that was leaking from a pile of debris located outside of the cargo operation area. *1010 In upholding the district court’s imposition of liability on the owner, the United States Court of Appeal Fifth Circuit focused on the fact that the dunnage and oil slick were outside of the work area of the stevedore crew; in addition, the court took notice of the fact that the stevedore foreman twice urged the vessel owner to eliminate the dangerous condition. Id. at 507-508.
Unlike Turner, plaintiff has not presented evidence that on the night of his accident that he or anyone else complained about the unsafe conditions in the hatch, contrarily, plaintiff testified that conditions on that night were as usual. Moreover, also unlike Turner, the evidence indicates that the area in which plaintiff was injured was in the control of the stevedore at all times. Plaintiff has not contended otherwise.
Plaintiff also cites Fernandez to stand for the proposition that “slippery and slimy conditions constitute actionable § 905(b) negligence.” We agree with plaintiff that such conditions may be actionable under § 905(b), but such conditions are not present in the instant case.
In Fernandez, a longshoreman slipped on a puddle of water that had accumulated from a dripping drainpipe leaking from a swimming pool on the above deck. An expert testified that it was not the water that was dangerous, but the accumulation of algae and slime under the water which created the hazard. In a per curiam, this court upheld the trial court’s finding of liability by applying a two-part test annunciated in Treadaway which requires that a plaintiff prove 1) the vessel put the foreign substanee on the deck or knew it was there, and willfully or negligently failed to remove it; 2) the foreign substance had been on the deck for along time so that it could have been discovered and removed by the vessel crew in its exercise of reasonable care. Treadaway, supra, at 166. Plaintiff has not alleged either element of the Treadaway test. Moreover, the conditions of which plaintiff complains, the water and the slime, were not foreign substances on the MARIA C, but an integral part of the stevedore operations and a constant in the pogy industry, unlike the conditions in Fernandez and Treadaway. This court can not imagine that such conditions are removable. Therefore, we find plaintiffs reliance on Turner and Fernandez misdirected.
To defeat plaintiffs claims defendant argues that the “steepness” of the vessel, and it slipperiness, are an integral part of the vessel as a result of its design, thus even if such a conditions are hazardous, the hazard exists in the design and is not actionable under § 905(b). See, Salvato v. Hakko Maritime Corp., 718 F.Supp. 1443 (N.D.Cal.1989); Treadaway, supra, at n. 24. We agree.
As the testimony bore out, the steepness of the MARIA C is not a result of Daybrooks’ actions or inactions as vessel owner, but is an inherent part of the vessel that can only be remedied by changing'the design or modifying the vessel. There is no evidence that Daybrook designed or modified the MARIA C. As [«testified by plaintiff the floor of the MARIA C is fine and slippery by nature, it is obvious to this court that when fish slime is added to the floor it would become more slippery. Furthermore, plaintiff indicated that he was fully aware of the steepness and slipperiness of the hold as he had been on the MARIA C hundreds of times, and that conditions on the night of the accident were as usual. In these hundreds of times plaintiff had never been injured, neither did he present any evidence that any other longshoreman had been injured on the MARIA C.
Plaintiff’s expert, David Cole, marine safety expert, testified that if a steel grate was installed in part of the hold some of the slipperiness could be averted. However, this expert had never conducted any studies regarding the steel grate or had never seen such a remedy in place on a pogy boat. He had only witnessed such a system on shrimp boats, which he admitted are designed differently.
Contrarily, defendant’s witness, Gordon Wallace, executive vice president and general manager of Daybrook Fisheries, testified that he had been in the pogy industry since 1971. He stated that all pogy boats were either made of steel or concrete. Wallace also stated that he had never witnessed such a grate on any pogy boat in the industry. *1011 We find this testimony persuasive in light of the fact that plaintiff has failed to present any evidence to contradict the testimony that industry standards differ. We can not impose upon Daybrook a requirement that the industry does not implement.
As in Salvato, we find that plaintiffs claims regarding the steepness of the vessel and its slipperiness are complaints of a design defect, which are claims of unseaworthiness and are non-actionable under § 905(b).
In addition, the trial court’s finding that “slippery water being recirculated” and inadequate lighting were causes of plaintiffs injury was also in error. 19AIthough these conditions may be causes of plaintiffs injury, they are insufficient to impose § 905(b) liability upon Daybrook. The Fifth Circuit has stressed that the “basic principle which emerges from Scindia is that the primary responsibility for the safety of the longshoremen rests upon the stevedore.” Randolph v. Laeisz, 896 F.2d 964, 970 (5 Cir.1990). To trigger a breach of the intervention duty a stevedore’s continued operations must be so “obviously improvident” as to “present an unreasonable risk of harm to the longshoreman.” We do not find that such conditions exist in the instant case.
The water being used by the MARIA C’s bailers was derived from a canal adjacent to the dock. The water proceeds through a series of pipe's to a land-based recirculating unit, where the water is filtered multiple times to remove particles. Wallace testified that such systems were used throughout the pogy industry. In addition, several parties, including plaintiff, testified it is the bailer who has control over the pressure of the water and can order a change of water if necessary. Wallace- agreed that the bailer and/or supervisor has the authority to request a water change.
Plaintiff has presented no evidence that the water on the night of the incident was hazardous. As plaintiff testified, conditions on that the night were as usual, and the MARIA C was the first vessel of the night to be unloaded. More important, plaintiff fails to present evidence that the water process was ever out of the stevedore’s control or that the continued use of the system was “obviously improvident” as to present an unreasonable risk of harm. Therefore, the finding by the trial judge that the dirty water imputes § 905(b) liability was in error.
We find the same holds true regarding the lighting. First, it must be noted that plaintiff has never alleged that the lighting was inadequate, this was only a | ipfinding by the trial court. Second, as in the case of the water, there is no evidence to indicate that the lighting was not in complete control of the stevedore. According to the testimony, the lights used in the hold were dangled from the dock into the hold of the vessel. Once again, this court can find no evidence that such conditions were so dangerous as to require Daybrook as vessel owner to have intervened during the bailing process. Because of this, the court is unable to find a reason why Daybrook as vessel owner could not rely on the stevedore operations to ensure that the lighting was adequate. See also, 29 C.F.R. § 1918.92(a).
As stated above we are not assisted by plaintiffs counsel that Daybrook breached any Scindia duty. Plaintiff fails to articulate any reasons other than Daybrook’s knowledge of the alleged hazards to support a finding otherwise. Instead, plaintiff makes a eonelusory assertion that such duties were breached without making a legal argument. Although not stated in his brief, at oral argument plaintiff argued to the court that it should not look at Daybrook as a “wearer of two hats”, which is an argument contrary to the law.
This court does not doubt that plaintiff suffered debilitating injuries resulting from a fall on the M/V Maria C, however, we can not impose liability under 33 U.S.C. § 905(b) on Daybrook Industries, Inc. and thereby reverse.
REVERSED.