Alvin J. TREADAWAY,
Plaintiff–Appellee,

and

Fidelity & Casualty Company of New York, Intervenor–Appellee,

v.

SOCIETE ANONYME LOUIS–DREY-FUS et cie, Defendant–Appellant.

No. 88–3830.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1990.

Rehearing Denied April 3, 1990.

Derek A. Walker, Peter B. Sloss, Kenneth J. Servay, Douglas L. Grundmeyer, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendant-appellant.

Terrence J. Lestelle, Lestelle & Lestelle, New Orleans, La., for Treadaway.

Linda S. Harang, John M. Sartin, Jr, Cornelius, Sartin & Murphy, New Orleans, La., for Fidelity & Cas. Co. of New York.

Before WISDOM, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

WISDOM, Circuit Judge:

This is the latest in a long series of cases involving the application of *Scindia* and 33 U.S.C. § 905 to a longshoreman's negligence suit against a vessel. We affirm the district court's finding of liability in favor of the longshoreman and against the vessel operator, but reverse the judgment with respect to the amount of damages.

## I. FACTS AND PROCEDURAL HISTORY

Alvin J. Treadaway, a longshoreman working aboard the M/V SOPHIE B, was injured when he slipped off of a step that was partially obstructed by a pipe.[1] On January 22, 1986, the date of the accident, the SOPHIE B was located mid-river at Ama, Louisiana. Treadaway and his gang

---

1. At the time of the accident, Treadaway was employed by Southern Stevedoring, Inc.

were loading grain aboard the vessel, a small bulk carrier with two holds. Treadaway fell while on his way to eat lunch in the "tally room" furnished for the longshoremen's use.[2] After his injury, Treadaway collected approximately $68,000 from his employer's compensation insurer, Fidelity & Casualty Company of New York (Fidelity). Fidelity also paid various medical expenses incurred by Treadaway. He then brought suit against Societe Anonyme Louis–Dreyfus (Louis–Dreyfus), the operator of the SOPHIE B,[3] under 33 U.S.C. § 905(b), the Longshoremen's and Harbor Workers' Compensation Act. Fidelity intervened in the suit to recover for its compensation payments and medical benefits.

The SOPHIE B's voyage began in Antwerp, Belgium. While crossing the Atlantic Ocean, the vessel encountered several days of rough seas, which caused some damage to the ship. In particular, the waves damaged a metal grill that served as a walkway to the tally room. Before arriving at its first destination, Mobile, Alabama, the vessel's chief mate threw the damaged grill overboard, exposing a number of pipes and the two-inch metal frame that supported the grill.

From Mobile, the SOPHIE B departed for Ama, Louisiana, arriving there on January 17, 1986. Before commencing loading operations at 11:50 on the night of January 21, the chief mate and the stevedore each inspected the ship, and found no oil or water in the area leading to the tally room. Before Treadaway's gang came aboard at 8:00 a.m. on January 22, the vessel's chief mate and the gang's foreman performed further inspections. Again, there was no report of oil or water near the tally room. The foreman recalled the absence of grat-

ing, but did not consider it to be a dangerous situation.

The tally room is located in the starboard, aft section of the main deck of the SOPHIE B. The main deck is one level below the gangway. To enter the tally room, Treadaway and the other longshoremen descended a ladder to the main deck, proceeded through the passage where the grill was missing, and then came upon the "junction box", a metal platform. Across from the junction box was the bulkhead and the water-tight door to the tally room. To facilitate passage over the coaming,[4] a single step was welded to the bulkhead just below the door. The step was over twenty-six inches from and seven inches down from the junction box.[5] A pipe three inches in diameter ran across the back of the step (parallel to the bulkhead), leaving approximately six to eight and one-half inches of unobstructed stepping surface.[6]

Treadaway introduced testimony that on the day of the accident the area around the tally room was covered with oil and water. One of his co-workers testified that the longshoremen had to "wade ... through" four or five inches of water in that area. The plaintiff testified that he saw oil coming through the pipes that usually were covered by grating. Both stated that these conditions existed from the moment they boarded the vessel, although neither of them reported this to the crew. The plaintiff also presented the testimony of a marine architect who told the jury that he had never seen a pipe placed over a step and that he considered the situation to be unsafe. Considering the step and the absence of grating, he described the area as "an accident waiting to happen".

2. A tally room is an area that is customarily provided to enable longshoremen to store belongings, to change clothes, and to eat meals while working aboard a vessel.

3. Louis–Dreyfus subsequently purchased the vessel. At the time of the accident, the SOPHIE B was owned by Societe Setaf–Saget of Paris, France.

4. The coaming is the raised border around a hatchway designed to keep water out. *Webster's New International Dictionary* 511 (2d ed. 1958).

5. A person seeking to enter the tally room could either take one long step from the junctions box to the step or step down to the deck and then back up to the step.

6. The plaintiff's expert marine architect, H.E. Breit, Jr., testified that the step had 5⅞ inches to 6⅞ inches of unobstructed step surface. The defendant's expert, Emmlyn Jones, testified that the step had 8.6 inches of unobstructed space.

The defendant provided testimony that the tally room area was inspected and accepted just before the commencement of the 8:00 a.m. shift, there was no oil or water in the area either before or after Treadaway's fall, the walkway was safe even without the grill, and the presence of the pipe on the tally room step was both common and safe.[7]

Treadaway began work shortly after 8:00 a.m. During the morning he had approached and entered the tally room on two occasions. On his third trip, around 11:30 a.m., Treadaway approached the single step leading to the room holding in his right hand a bag of boxed lunches for his gang. From his position on the junction box, he put his right foot on the step and attempted to pull himself through the doorway with his left hand, a hand that was weakened because of a prior condition. His foot hit the pipe on the back of the step and he fell backward. The fall fractured his coccyx and resulted in a mild concussion. Treadaway continued to work after the fall, operating the "button box", the control panel that directs the spout during loading, but he was unable to finish the work-day.

The jury returned a verdict finding Louis–Dreyfus seventy-five percent at fault and Treadaway twenty-five percent at fault. It assessed a total of $298,000 in damages for the plaintiff. The defendant filed motions for judgment notwithstanding the verdict or, alternatively, for a new trial. The district court denied both motions. The defendant then filed this appeal, principally arguing three issues: 1) that the district court erred in denying its post-trial motions because there was no evidence of negligence, 2) that the district court committed prejudicial error by not instructing the jury on the distinction between negligence and unseaworthiness, and 3) that the jury awarded an excessive amount of damages.

## II. DISCUSSION

### A. Motions for Judgment Notwithstanding the Verdict and New Trial

Louis–Dreyfus argued in its post-trial motions that Treadaway presented no evidence from which the jury could have found that the defendant's negligence caused his fall. It argued that the obstruction of the step by the pipe, if it was a defect, was a design defect and was the sole cause of the accident. Because Louis–Dreyfus did not design or modify the step, the jury necessarily had to base its finding of liability on unseaworthiness. Further, Louis–Dreyfus argued that the obstruction was obvious, and that plaintiff was a "careless and inattentive stevedore" who should not recover. The trial court denied both motions.

#### 1. Standard of Review

■ Our standard of review with respect to motions for directed verdict and for judgment notwithstanding the verdict is based on the principle that "it is the function of the jury as the traditional finder of fact, and not the Court, to weigh conflicting evidence ...".[8] Accordingly, these motions are inappropriate to reverse a jury's decision unless consideration of all of the evidence and inferences favorable to the nonmoving party convinces the Court that no reasonable jury could arrive at a contrary verdict.[9]

■ The decision to grant or deny a motion for new trial is a matter for the trial court's discretion, and this Court will reverse its ruling only for an abuse of that discretion.[10] When, as here, the trial judge has refused to grant a new trial, "all the

---

**7.** There was no evidence of any prior accidents in the vicinity of the tally room that would have alerted the defendant to the potential hazard.

**8.** *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir.1969) (en banc).

**9.** *Id. See also Argubright v. Beech Aircraft Corp.,* 868 F.2d 764 (5th Cir.), *reh'g denied,* 1989 WL 20596, 1989 U.S.App. LEXIS 5547 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 325, 107 L.Ed.2d 315 (1989).

**10.** *Dotson v. Clark Equip. Co.,* 805 F.2d 1225 (5th Cir.1986).

factors that govern our review of his decision favor affirmance".[11]

## 2. Evidence of Negligence

■ Since the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA),[12] as clarified by the landmark case *Scindia Steam Navigation Co. v. De Los Santos*,[13] a vessel owner or operator[14] is no longer liable to a longshoreman for injuries caused by a vessel's unseaworthiness.[15] A longshoreman must prove negligence to recover from the shipowner or operator.[16]

■ *Scindia* explained that before commencement of loading or unloading operations, a shipowner owes two duties to longshoremen: 1) to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety", and 2) to warn the stevedore of any hidden dangers of which the ship is, or should be, aware.[17] Once the stevedoring operations have begun, the vessel has no general duty to discover dangerous conditions that develop, but an exception exists when the vessel knows of a dangerous condition and of the stevedore's unreasonable response to it.[18] We have consistently adhered to this statement of the law in this Circuit.[19]

■ This case involves the vessel's duties to exercise ordinary care and to warn of defects before operations commence. In support of the judgment below, Treadaway argues that Louis-Dreyfus was negligent in three respects: Louis–Dreyfus 1) failed to detect and eliminate water and oil in the area leading to the tally room, 2) did not replace the missing grill that served as the walkway near the tally room,[20] and 3) failed to warn the longshoremen or stevedore that a pipe partially obstructed the surface of the step into the tally room. We find that the evidence adduced at trial adequately supports the judgment on the ground that Louis–Dreyfus breached its duty to exercise ordinary care to provide

11. *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir.1982).

12. 33 U.S.C. § 905(b) provides in relevant part: In the event of injury to a person covered under this chapter caused by the negligence of the vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.

13. 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1972).

14. The definition of the word "vessel" in 33 U.S.C. § 902(21) includes a vessel's owner, owner pro hac vice, agent, and operator.

15. The warranty of seaworthiness obliges the vessel owner to guarantee the safety of the ves-

sel without regard to fault. *Hill v. Texaco, Inc.,* 674 F.2d 447, 452 n. 6 (5th Cir.1982).

16. Prior to 1972, an injured longshoreman could recover from the vessel by proving negligence or unseaworthiness. *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). In exchange for the elimination of the unseaworthiness theory of liability, Congress raised the compensation payments for injured longshoremen. *Harris v. Flota Mercante Grancolombiana, S.A.,* 730 F.2d 296 (5th Cir.1984).

17. *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622.

18. *Id.* at 175, 101 S.Ct. at 1626.

19. *See, e.g., Woods v. Sammisa Co.,* 873 F.2d 842 (5th Cir.), *reh'g denied en banc,* 878 F.2d 1435 (5th Cir.1989); *Theriot v. Bay Drilling Corp.,* 783 F.2d 527 (5th Cir.1986).

20. Treadaway also argues that Louis–Dreyfus was negligent in painting the step and pipe the same color, green, which made it more difficult for one to notice the pipe. The plaintiff's counsel argued that prior to the accident the pipe was white, implying that it was more easily noticed then. We note, however, that Treadaway testified that at the time of the accident the pipe was white, not green.

the plaintiff a reasonably safe place to work.

■ Treadaway and a fellow longshoreman testified that at the time of the accident, water and oil covered the area on the main deck in the vicinity of the tally room, and that the longshoremen had to walk through the oil to enter the room set aside for them. Under *Scindia*, however, merely proving that an unsafe condition existed at the time of the accident is insufficient to establish liability.[21] The shipowner does not have an absolute duty to provide a longshoreman a safe vessel on which to work; his duty is to exercise ordinary care to do so. The Senate and House Reports on the 1972 amendments to the LHWCA provide an example of the operation of this principle by addressing the burden of a longshoreman who slips on oil:

> To recover he must establish that: 1) the vessel put the foreign substance in the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances.[22]

Although there was no evidence that the vessel put the foreign substance on the main deck, there was sufficient evidence for the jury to conclude that the shipowner knew or should have known of its presence in the exercise of ordinary care. Two witnesses (including the plaintiff) testified that from the time they boarded the vessel shortly after 8:00 a.m., water and oil covered areas of the main deck, and that this condition persisted through the time of the plaintiff's fall at 11:30 a.m. Although the vessel's chief mate and the plaintiff's foreman testified that their separate inspections of the vessel before operations began revealed no foreign substance on the main deck, the jury was entitled to believe the plaintiffs' witnesses instead.[23] In effect, the jury decided that water and oil were present at the commencement of operations and that the shipowner either knew or would have known of its presence had a thorough investigation of the vessel been conducted before operations commenced.[24] With respect to causation, we find that the jury reasonably could have inferred that the presence of oil and water on the deck across which the plaintiff walked caused him to fall.

### 3. Open and Obvious Condition

■ The plaintiff safely traversed the main deck on his way to the tally room on at least two previous occasions on the morning of the accident, and he testified he lost his balance while negotiating this passage. To the contrary, he agreed that he made it to the junction box, located just in front of the step, and stopped before proceeding to step across. Causation is the missing element with respect to this condition. The jury reasonably may have inferred, however, that the plaintiff's fall was caused by the presence of oil beneath the pipes.

Nor do we ground our decision on Louis–Dreyfus's breach of the duty to warn the longshoremen of an alleged hidden hazard—the pipe that passed horizontally over the back of the step. The evidence shows that Louis–Dreyfus did not design or modify the pipe (see note 20). Thus, if it was a hazard, it was so by virtue of a design defect. The step was not in disrepair, and there were no reports of previous accidents due to the step. We save for another day the question whether a vessel may be held liable for failure to warn of a design defect that is in its original condition, or whether that would amount to letting unseaworthiness in through the back door.

**21.** *See, e.g., Hill v. Texaco, Inc.*, 674 F.2d 447, 451–52 (5th Cir.1982).

**22.** S.Rep. No. 1125, 92d Cong., 2d Sess. 10–11; H.R.Rep. No. 1441, 92d Cong., 2d Sess. 6–7, reprinted in 1972 U.S.Code Cong. & Admin. News, 4698, 4704. The report was quoted in *Lampkin v. Liberia Athene Transp. Co.*, 823 F.2d 1497 (11th Cir.1987).

**23.** *Gibraltar Sav. v. Ldbrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir.1988) ("Weighing the conflicting evidence and the inferences to be drawn from that evidence and determining the relative credibility of the witnesses, are the province of the jury ..."), *cert. denied*, — U.S. —, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989).

**24.** We do not base our affirmance of the judgment on Louis–Dreyfus's failure to replace the missing grating, which left exposed pipes as a walkway to the tally room. The area missing the grill was located at least six feet away from the step, and the plaintiff never suggested that

that he knowingly passed through the oil and water then. Another witness testified that the water and oil on the main deck were in such a quantity as to be clearly visible. Thus, the question arises whether the plaintiff's knowledge of the dangerous condition or its obviousness precludes his recovery. We hold that it does not. *Stass v. American Commercial Lines, Inc.*[25] is on point. A longshoreman working on a barge noticed sprouted soybean and other grain in damp areas on the deck. Despite his knowledge that the growth would cause the deck to be slippery, he continued to work and later slipped and injured his coccyx. We noted that since *Scindia* "the shipowner has no defense that the hazard was ... open and obvious ...",[26] and, quoting a Note in the Tulane Law Review, held that "a longshoreman's own knowledge of a shipboard hazard will not negate a shipowner's duty of care which would exist otherwise".[27] We have followed that rule repeatedly, and we do so again today.[28]

Some of our decisions look to a longshoreman's alternatives when he is faced with an obviously unsafe condition. In *Morris v. Compagnie Maritime des Chargeurs Reunis*,[29] we stated that a longshoreman faced with a shipboard hazard "need show only that the circumstances made safer alternatives unduly impractical or time-consuming".[30] Although the chief mate of the SOPHIE B testified that there was an alternate route to the tally room, there was also testimony that this second passage was locked on the day of the accident. The vessel was located in mid-river, and the tally room was the only area given to the longshoremen in which to eat their

meals. The plaintiff has satisfied the light burden imposed by *Morris.*

Considering the evidence and inferences in favor of the plaintiff, we cannot say that no reasonable jury could have returned a verdict in favor of the plaintiff. For the same reasons, we uphold the trial judge's refusal to grant a new trial to the defendant as a proper exercise of his discretion.

**B. Jury Instructions**

Louis–Dreyfus timely objected to the district court's failure to give its proposed jury instruction that distinguished the theories of unseaworthiness and negligence. On appeal, Louis–Dreyfus argues that the absence of its requested instruction misled the jury into thinking that it could find liability based on a design defect. The defendant did not object to the substance of the court's instruction on negligence.

**1. Standard of Review**

We review a trial judge's instructions to the jury with deference, for "[i]t is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved ...".[31] We use a two-part test to evaluate objections to the failure to give a requested instruction. As a threshold matter, the complaining party must show that the proposed instruction correctly states the law. If it does, the court will determine whether the instructions actually given were accurate or misleading.[32] A

---

**25.** 720 F.2d 879 (5th Cir.1983).

**26.** *Id.* at 882.

**27.** *Id.,* quoting Note, 56 Tul.L.Rev. 1421, 1432 (1982).

**28.** *See, e.g., Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 536 (5th Cir.1986); *Harris v. Flota Mercante Grancolombiana, S.A.,* 730 F.2d 296, 299 (5th Cir.1984); *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243, 1247 (5th Cir.1982); and *Lemon v. Bank Lines, Ltd.,* 656 F.2d 110, 116 (5th Cir.1981).

**29.** 832 F.2d 67 (5th Cir.1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988).

 We also note that the jury assessed Treadaway twenty-five percent comparative negligence.

**30.** *Id.* at 71.

**31.** *Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 424–25 (5th Cir.1985) (quoting 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2556 (1971)).

**32.** *Id.*

judgment will be reversed only when "the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations".[33]

## 2. Accuracy of the Proposed and Actual Instructions

 The final sentence of Louis–Dreyfus's proposed charge contains its essence: "[I]f defendant did not design, construct or otherwise locate the pipe on the step into the deck office of the M/V SOPHIE B, defendant cannot be liable for the location or position of that pipe". The charge seems to exclude liability for failure to warn of a hidden hazard not created by the shipowner. The question whether there is a duty to warn of a design defect that is in its original condition is one that we have not decided.[34] We need not address it now because even assuming that the proposed charge was correct, we find that the trial judge adequately instructed the jury that the defendant could be found liable only if it was negligent. The trial judge instructed the jury that the plaintiff had to prove negligence to prevail. He then accurately explained to them the duties that a vessel owes to a longshoreman, stressing that the obligation is to exercise "ordinary care, not extraordinary care: Reasonable safety, not absolute safety". Although some differentiation of unseaworthiness may have been helpful, the jury was properly guided in its deliberations.

## C. Damages

The jury concluded that Treadaway sustained $298,000 in damages as a result of his accident.[35] Louis–Dreyfus argues that the amounts for two components of this award, past lost wages and loss of earning capacity, are clearly excessive and should be reduced. Louis–Dreyfus also contends that the award for past lost wages includes an amount for lost fringe benefits that the plaintiff did not adequately prove.

### 1. Standard of Review

"This court will not overturn a damage award unless the trier of fact abused its discretion." [36] We will, however, overturn an excessive verdict, one that is greater than the maximum amount the jury properly could have awarded.[37] This Court will review each award based on the facts of the case,[38] and if we determine that an award is excessive, we may either order a new trial on damages or give the plaintiff the option of accepting a remittitur of the excessive portion of the award.[39]

### 2. Past Lost Wages

Louis–Dreyfus objects to the award for past lost wages on two grounds: 1) that it is clearly excessive in the light of the evidence, and 2) that it includes an amount for fringe benefits that the plaintiff did not sufficiently prove.

Excluding prejudgment interest, Dr. Seymour Goodman, the plaintiff's economist, testified that the plaintiff lost $73,837.22 in past wages and benefits as a result of his

---

**33.** *McCullough v. Beech Aircraft Corp.,* 587 F.2d 754, 759 (5th Cir.1979) (quoting *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076, 1100 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)).

**34.** *See* note 20.

**35.** The jury awarded the following damages:

| | |
|---|---|
| Past lost wages & benefits | $ 75,000 |
| Loss of earning capacity & future benefits | $170,000 |
| Past medical expenses | $ 10,000 |
| Future medical expenses | $ 8,000 |
| Past physical & mental pain & suffering | $ 25,000 |
| Future physical & mental pain and suffering | $ 10,000 |
| Permanent physical disability | $ 0 |
| Total | $298,000 |

**36.** *Hernandez v. M/V RAJAAN,* 841 F.2d 582, 587 (5th Cir.), *corrected, reh'g denied,* 848 F.2d 498 (5th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 530, 102 L.Ed.2d 562, 970 (1989).

**37.** *Id.*

**38.** *Winbourne v. Eastern Airlines, Inc.,* 758 F.2d 1016, 1018 (5th Cir.1984), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 582 (1985).

**39.** *Osburn v. Anchor Laboratories, Inc.,* 825 F.2d 908, 919 (5th Cir.), *reh'g denied,* 834 F.2d 425 (5th Cir.1987), *cert. denied,* 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988).

accident.[40] Dr. Kenneth Boudreaux, the defendant's economist, arrived at a lower amount.[41] The jury awarded Treadaway $75,000 for this element of damage.

■ This circuit follows a "maximum recovery rule" in reviewing awards.[42] Applying that rule, we find that the jury exceeded the maximum amount it could have awarded based on the evidence. There is no evidentiary support in the record for an amount in excess of the figure supplied by the plaintiff's own economist. We conclude that the award is excessive to that extent.

Louis–Dreyfus also contends that the plaintiff did not adequately prove the value of lost fringe benefits. It argues that the plaintiff's economist calculated these benefits on the basis of the employer's contributions and not on the actual amount that Treadaway would have received. Louis–Dreyfus bases this argument on dictum in *Williams v. Reading & Bates Drilling Co.* [43] The defendant in that Jones Act case argued that the economic cost of fringe benefits was not established by competent evidence because it was based on the employer's "benefits statement", which reflected the cost of providing benefits and not their value to the employee. Emphasizing its deferential standard of review and that the case was tried to the court, not a jury, this Court affirmed the award.

■ *Williams* held that "the district court's determination that fringe benefits constituted additional compensation over and above the plaintiff's wages was not clearly erroneous". The question revolved around the plaintiff's thoroughness and professionalism in presenting evidence of his losses. In this case, Treadaway presented the expert testimony of an econ-

omist on the subject of his pecuniary losses. The plaintiff did not simply present a "benefits statement" to the jury. Rather, his economist based his calculations on the employer's specific hourly contribution to the union's welfare and pension funds as mandated by a collective bargaining agreement. He then performed a present value adjustment. We think that the plaintiff has satisfied his burden of proof on this issue.

### 3. Loss of Earning Capacity

■ Louis–Dreyfus next argues that the jury's award for loss of earning capacity and future benefits is clearly excessive. We agree. "An award for impaired earning capacity is intended to compensate the worker for the diminution in [his] stream of income." [44] Thus, we said in *Masinter v. Tenneco Oil Co.*[45] that the "base figure used to calculate future wage loss is the difference between what a person could have earned 'but for' the accident and what he is able to earn upon returning to work . . .".[46]

First, this award exceeded the projections of even the plaintiff's own economist for lost future earnings assuming that the plaintiff will never return to any employment. The jury awarded $170,000; the plaintiff's expert predicted $165,877.02. Second, and more importantly, although it appears from the record that Treadaway may no longer be physically able to do longshoring work, the jury apparently did not consider the undisputed evidence that he will be able to return to full-time sedentary employment. The testimony of Treadaway's treating physician and his vocational counselor indicates that there are minimum wage jobs for which Treadaway is qualified and physically able.[47] According

---

**40.** Dr. Goodman estimated total lost wages after taxes to be $55,005.34 and loss of fringe benefits to be $18,831.88.

**41.** The defendant's economist estimated past lost wages to be $57,830, excluding fringe benefits, which he found too speculative to assess.

**42.** *Gautreaux v. Insurance Co. of N. America,* 811 F.2d 908, 913 (5th Cir.1987).

**43.** 750 F.2d 487 (5th Cir.1985).

**44.** *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).

**45.** 867 F.2d 892 (5th Cir.1989).

**46.** *Id.* at 899.

**47.** Treadaway's vocational counselor testified that considering the plaintiff's age, health, and ability, she believes that he could work as a game room or laundry room attendant, among other jobs.

to *Masinter*, this amount should be deducted from the award. Assuming full-time, minimum wage employment, the plaintiff's expert projected a $134,955.61 loss of future income. Following the maximum recovery rule, we hold that this amount is the most that the jury properly could have awarded for this component of damages.

## III. CONCLUSION

We affirm the judgment below in all respects except the amount of damages. With respect to the monetary award of $298,000, we give the plaintiff the option of accepting a remittitur of $36,207.17,[48] thus reducing the total award to $261,792.83, or proceeding with a new trial on damages.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

**48.** This amount reflects a reduction of $1,162.78 from the award for past lost earnings and $35,-044.39 from the award for loss of earning capacity.