DISTRICT COUNCIL 37, AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL–CIO; Joseph R. Zurlo; James Welsh; Charles J. Santarpia and Frank Desena, on behalf of themselves and all individuals similarly situated, Plaintiffs–Appellants,

v.

NEW YORK CITY DEPARTMENT OF PARKS AND RECREATION; The City of New York; New York City Department of Personnel, Defendants–Appellees.

No. 66, Docket No. 96–7050.

United States Court of Appeals,
Second Circuit.

Argued Oct. 23, 1996.

Decided May 14, 1997.

Debra L. Raskin, New York City (Ivan D. Smith, James D. Esseks, Vladeck, Waldman, Elias & Engelhard, of counsel), for Plaintiffs–Appellants.

Jane L. Gordon, Office of the Corporation Counsel, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Stephen J. McGrath, Office of the Corporation Counsel, of counsel), for Defendants–Appellees.

Before MESKILL, CALABRESI and CABRANES, Circuit Judges.

MESKILL, Circuit Judge:

Plaintiffs are a certified class of former New York City Parks Department employees who were laid off as a result of cuts to the Parks Department's budget. Plaintiffs sued in the United States District Court for the Southern District of New York, Schwartz, *J.*, alleging, among other things, that the layoffs had a disparate impact on employees age 40 and older, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. After a jury trial, the jury returned a verdict for defendants.

On appeal, plaintiffs request a new trial. Plaintiffs argue that under *Connecticut v. Teal*, 457 U.S. 440, 452–56, 102 S.Ct. 2525, 2533–36, 73 L.Ed.2d 130 (1982), the district court erred when it refused to instruct the jury that a nondiscriminatory "bottom line" was no defense to a disparate impact claim. We conclude that the jury instructions were adequate, and affirm.

## BACKGROUND

From 1991 to 1992, the City of New York cut the Parks Department's annual budget from $176 million to $108 million. Because the Parks Department spent $160 million annually on salaries, it had to lay off a large number of employees.

Under New York law, the Parks Department could decide which of its job titles to cut and how many employees within those job titles to cut. However, once that decision was made, New York law determined which specific employees within a job title would be cut. Temporary employees within a job title had to be laid off before permanent employees. *See* N.Y.Civ.Serv.Law § 65(3) (McKin-

ney 1983); *Kerr v. Weisenberg,* 65 A.D.2d 815, 817, 410 N.Y.S.2d 351, 353 (2d Dep't 1978), *aff'd,* 49 N.Y.2d 870, 427 N.Y.S.2d 935, 405 N.E.2d 179 (1980) (affirming for the reasons stated by the Appellate Division). Once all the temporary employees within a job title had been laid off, permanent employees within the job title had to be laid off in inverse order of seniority. N.Y.Civ.Serv.Law § 80(1) (McKinney 1983). Thus, determining which employees would be laid off involved a three-step process: first, the Parks Department decided which job titles to cut and how deeply to cut; second, the temporary employees within the selected titles were laid off; and third, permanent employees within the selected titles were laid off in inverse order of seniority.

After evaluating its needs, the Parks Department decided to lay off 1,585 of its 5,180 employees. The Parks Department laid off varying numbers of employees across its 128 job titles. Among the many cuts the Parks Department made, it entirely eliminated the job title "Laborer."[1] Everyone employed as a Laborer was over the age of 40 and their average age was 57.

The former Laborers sued the Parks Department, claiming that the Parks Department's decisions as to which job titles to cut and how deeply to cut resulted in a disparate treatment of and a disparate impact on employees age 40 and older, in violation of the ADEA. The disparate treatment claim has been abandoned and is not before us on this appeal. We therefore will examine only the disparate impact claim.

The case went to trial, and at trial each party offered an expert witness in the field of statistics. The experts agreed that as a result of the entire three-step layoff process, the Parks Department actually grew older. While 48 percent of the original Parks Department work force was age 40 or older,

only 40 percent[2] of those laid off were age 40 or older. In other words, of those employees who were laid off, employees age 40 and older were underrepresented.

Plaintiffs' expert testified that despite this bottom line result, the layoff process nevertheless had a disparate impact on employees age 40 and older. Plaintiffs' expert focused his attention on the first step in the layoff process, the Parks Department's decisions as to which job titles to cut and how deeply to cut, which was the only step the Parks Department had any control over.

Plaintiffs' expert used a computer to simulate nondiscriminatory layoffs. The computer randomly selected 1,585 employees (the number of employees actually laid off) of the 4,916 Parks Department employees who were at risk of being laid off—however, the computer would not necessarily lay off the employees it had selected. Instead, the computer would note how many employees were chosen from a job title, and would determine which specific employees to cut from that title using the temporary-employees-first rule and the seniority rule. Once the computer determined which Parks Department employees to lay off, the computer calculated the percentage of those employees that were age 40 or older. The computer then repeated the process 10,000 times, and at the end, calculated how many employees age 40 or older were laid off on average.

Based on this computer simulation, plaintiffs' expert concluded that if the Parks Department had randomly selected which job titles to cut and how deeply to cut, and the second and third steps in the layoff process were then used to determine who within the selected titles would be laid off, on average 32 percent of the workers laid off would have been age 40 or older. In contrast, 40 percent

---

**1.** Of the 187 Laborers, 15 were actually laid off, 10 were "bumped" to other job titles, 161 chose to retire rather than be laid off, and 1, who had job protection because of a disability, was retained. We will refer to the layoffs, downgrades and retirements collectively as "layoffs."

**2.** The experts disagreed about what percentage of the employees laid off was age 40 or older. Somewhat surprisingly, the number the plaintiffs' expert used (40%) was actually lower than

the number the Parks Department's expert used (44%). The discrepancy is irrelevant because both experts agree that the percentage of employees age 40 or older that were laid off (40% or 44%) was less than the percentage of employees age 40 or older in the entire Parks Department work force (48%). Purely for convenience, we have elected to use the 40% figure offered by the plaintiffs' expert. However, we do not decide whether the appropriate figure is 40% or 44%.

of the workers actually laid off were age 40 or older.[3] Plaintiffs' expert testified that if layoffs were made without regard to age, the likelihood that 40 percent of those laid off would be age 40 or older was approximately 1 in 10,000. Based on this analysis, he testified that titles which predominantly employed workers age 40 and older had been targeted for layoffs in the first step of the layoff process.

Plaintiffs' expert explained that the bottom line nevertheless favored employees age 40 and older because the second step, which required that temporary employees be laid off first, and the third step, which required that permanent employees be laid off in inverse order of seniority, both favored employees age 40 and older. The net effect of these three steps was that out of the employees laid off, those age 40 and older were underrepresented.

To summarize, it was plaintiffs' position that although employees age 40 or older represented 48 percent of the work force but represented only 40 percent of those laid off, the layoffs nevertheless had a disparate impact on employees age 40 and older because only 32 percent of the employees laid off should have been age 40 or older.

The Parks Department attacked the data used by plaintiffs' expert. When the Parks Department hires a new employee, the employee sometimes starts as a temporary employee and later becomes a permanent employee. When conducting layoffs, the Parks Department uses the date the employee became a permanent employee to determine seniority. However, when the expert's computer was determining which employees within a title were the least senior and hence would be laid off, the computer used the employees' initial hire date to calculate seniority rather than the date the employee became a permanent employee. The Parks Department argued that this error could lead the computer to select the wrong person for layoff, and that therefore, the computer simulation was flawed.

Further, the Parks Department's expert also testified that the Parks Department did not target older job titles for layoffs in the first step of the layoff process. The Parks Department's expert computed the average age of the employees from each title and used statistical analysis to determine whether the titles with higher average employee ages were selected for more severe cuts. She concluded that there was no relationship between the average employee age of a title and whether the title was selected for severe cuts. In other words, she testified that titles which predominantly employed workers age 40 and older had not been targeted for layoffs in the first step of the layoff process.

After the close of testimony, plaintiffs asked the district court to instruct the jury as follows:

> If you find that the defendants' decision as to which job titles to cut, and how deeply to cut within those titles, had a disparate impact on older workers, then I instruct you that it was no defense for the defendants to assert that older workers were under- or over-represented among those ultimately affected by the layoffs. In other words, I instruct you that the "bottom-line" results of the June 1991 reduction in force are not relevant to whether plaintiffs have shown disparate impact; your inquiry should focus on the employment practice identified by plaintiff.

The district court refused to give the requested instruction, and instead instructed the jury, in pertinent part, as follows:

> As a first step in proving their claim under disparate impact theory, plaintiffs must show by a preponderance of the evidence that a specific or particular employment practice or decision had a significantly disparate impact on Parks Department employees who were aged 40 or older. Plaintiffs claim that the defendants' decisions as to which job titles to cut [and] how deeply to cut within each title had a significantly disparate impact on workers over 40. In determining whether plaintiffs have proven disparate impact by a preponder-

---

**3.** Plaintiffs' expert testified that the difference was statistically significant. For a discussion of the meaning of statistically significant, *see Otta-* *viani v. State University of New York at New Paltz,* 875 F.2d 365, 371–72 (2d Cir.1989).

ance [of the] evidence, you may consider the statistical evidence offered by both parties.

If you find that plaintiffs have identified an employment practice, and have demonstrated that that employment practice had a significantly disparate impact on workers age 40 and above, then plaintiffs have satisfied the first element of proof required under disparate impact and you may move onto the next stage. If you find that plaintiffs have not proved that the defendants' employment practice had a disparate impact on workers over 40, then you must find for defendants on the disparate impact theory.

The court went on to instruct the jury on other elements of a disparate impact claim.

At the conclusion of the trial, the jury returned a verdict for the Parks Department on the plaintiffs' disparate impact claim. On the jury verdict form, the jury answered "no" to the question whether the Parks Department's choice of which job title to cut and how deeply to cut within each title "had a disparate impact" on employees age 40 and older. Therefore, the jury did not proceed to answer the remaining questions about plaintiffs' disparate impact claim, such as whether the Parks Department presented a nondiscriminatory justification for the layoffs or whether there were alternative means of achieving the Parks Department's budget goals that would have had a lesser disparate impact on older workers. The jury also found for the Parks Department on plaintiffs' disparate treatment claim.

Plaintiffs appeal only their disparate impact claim. On appeal, plaintiffs, relying on *Teal*, 457 U.S. at 452–56, 102 S.Ct. at 2533–36, contend that the district court committed reversible error when it refused to instruct the jury that if the plaintiffs identified an employment practice that had a significant disparate impact on older workers, the fact that the layoffs were nondiscriminatory at the bottom line was no defense. We conclude that the jury instructions were adequate, and affirm.

## DISCUSSION

### I. *Disparate Impact Claims*

■ The ADEA makes it unlawful for employers to discriminate on the basis of age against employees age 40 or older. 29 U.S.C. §§ 621–634. A plaintiff alleging age discrimination can sue under disparate treatment or disparate impact theories. *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir.1992); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (establishing disparate impact claims under Title VII). The essence of a disparate treatment claim is that the employer intentionally discriminated against a member of a protected class. In contrast, "[d]isparate impact . . . results from the use of employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on a protected group and cannot be justified by business necessity." *Maresco*, 964 F.2d at 115 (internal quotation and alteration omitted).

Although the Supreme Court has not decided whether a disparate impact claim could be made under the ADEA, *see Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (reserving the issue), in *Maresco*, we held that disparate impact claims can be made under the ADEA, *Maresco*, 964 F.2d at 115. Therefore, despite the Parks Department's argument to the contrary, plaintiffs can make a disparate impact claim under the ADEA.

■ Further, although disparate impact claims are generally used to challenge objective employment practices, *see Griggs*, 401 U.S. 424, 91 S.Ct. 849, disparate impact claims can also be used to challenge subjective employment practices, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 989–91, 108 S.Ct. 2777, 2786–87, 101 L.Ed.2d 827 (1988). Therefore, the subjectivity of the Parks Department's decisions as to which job titles to cut and how deeply to cut does not affect our analysis.

■ To succeed on a disparate impact claim, a plaintiff must make out a *prima facie* case by showing that the plaintiff is a member of a protected class and that a chal-

lenged employment practice had a significant disparate impact on that class. *Waisome v. Port Authority of New York and New Jersey,* 948 F.2d 1370, 1374–75 (2d Cir.1991). An employer may then show that the challenged practice had a legitimate purpose. *Id.* at 1375. If the employer meets this burden, the plaintiff must prove that the proffered purpose is pretextual. *Id.*

As mentioned above, the jury here concluded that plaintiffs did not make a *prima facie* case of disparate impact.

## II. *Establishing a Prima Facie Case of Disparate Impact*

A plaintiff can establish a *prima facie* case of disparate impact by showing that at the bottom line, a challenged employment practice had a significant disparate impact on a protected class of which the plaintiff is a member. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 653 & n. 8, 109 S.Ct. 2115, 2122–23 & n. 8, 104 L.Ed.2d 733 (1989).[4] Therefore, if the plaintiffs here established that the Parks Department's decision had a significant disparate impact on plaintiffs at the bottom line, they would have made a *prima facie* case of disparate impact. However, as is discussed below, this is not the only way the plaintiffs could establish a *prima facie* case.

In *Teal,* 457 U.S. 440, 102 S.Ct. 2525, the State of Connecticut gave a group of its employees a written test and only those employees who received a passing score were eligible for promotion. *Id.* at 443, 102 S.Ct. at 2528–29. Black employees failed the test at a significantly higher rate than white employees, and those black employees who failed the test were ineligible for promotion. *Id.* at 443–44, 102 S.Ct. at 2529. However, Connecticut used an affirmative action program to select which employees who had passed the test would actually be promoted. *Id.* at 444, 102 S.Ct. at 2529. The bottom line result was that black employees were promoted at a higher rate than white employees. *Id.*

The black employees who failed the test sued Connecticut for employment discrimination, arguing that the test had a disparate impact on them. *Id.* Connecticut argued that there was not a disparate impact because black employees were promoted at a higher rate than white employees at the bottom line. *Id.* at 452–53, 102 S.Ct. at 2533–34.

The Supreme Court rejected Connecticut's argument, stating: "It is clear that Congress never intended to give an employer license to discriminate against some employees on [an illegal basis] merely because he favorably treats other members of the employees' group." *Id.* at 455, 102 S.Ct. at 2535. Accordingly, the Court held that employees can make a *prima facia* case of disparate impact by showing that a step in an employment practice had significant disparate impact on a protected class of which the employee was a member, regardless of whether the bottom line was discriminatory. *Id.* at 452–56, 102 S.Ct. at 2533–36; *see also Waisome,* 948 F.2d at 1378 ("An employer may not rely on a bottom-line defense, by that we mean that though parts of the employer's hiring or promotion procedures adversely affected members of a protected group, it may not successfully argue that a sufficient number of protected group members were nevertheless hired or promoted so as to refute proof of disparate impact."); *Newark Branch, N.A.A.C.P. v. Town of Harrison,* 940 F.2d 792, 800–01 (3d Cir.1991) ("The teaching of *Teal* is that disparate impact analysis will be used to measure the effect of each component of a selection system.") (emphasis and quotation omitted).

Plaintiffs contend that under *Teal,* they would have established a *prima facie* case of disparate impact if they established that the first step in the layoff process, the Parks Department's decision as to which job titles to cut and how deeply to cut, had a disparate impact on workers age 40 or over, and that a nondiscriminatory bottom line was no defense to their claim.

In contrast, the Parks Department contends that under *Teal,* if the bottom line is

---

4. Portions of *Wards Cove Packing Co.* have been superseded by statute. *Compare Wards Cove Packing Co.,* 490 U.S. at 659–70, 109 S.Ct. at 2126–32, *with* 42 U.S.C.2000e–2(k). However, the portions of *Wards Cove Packing Co.* that we rely on are unaffected.

nondiscriminatory, a disparate impact claim cannot be made to a step in the layoff process that is "non-dispositive," or in other words, a step that affects an employee, "but that does not *in itself* create an *outright barrier*" to that employee's receiving consideration under subsequent steps. *See Koger v. Reno,* 98 F.3d 631, 639 (D.C.Cir.1996) (reserving issue). The Parks Department points out that in *Teal,* the challenged step was a dispositive barrier, as everyone who failed the test would not be considered in subsequent steps. The Parks Department contends that, in contrast here, their first step—the decision as to which job titles to cut and how deeply to cut—was not dispositive of whether plaintiffs would be laid off. Rather, the Parks Department contends that it was the second and third steps in the layoff process that determined whether plaintiffs would be laid off.

Teal originated in this Circuit, and when we decided the case, we discussed the very argument that the Parks Department now makes. We stated, in pertinent part:

> Viewing the overall results of [an employment] process ordinarily is a prudent course to pursue, since it places the burden upon the defendant to demonstrate [a legitimate purpose for a challenged practice] only in situations in which courts can determine with some degree of certainty that [an employment process] has discriminatorily denied an employment opportunity to members of a protected class. Where all of the candidates participate in the entire [employment] process, and the overall results reveal no significant disparity of impact, scrutinizing individual [steps] would, indeed, "conflict[ ] with the dictates of common sense." Where, however, an identifiable [dispositive] barrier denies an employment opportunity to a disproportionately large number of [members of a protected class] and prevents them from proceeding to the next step in the [employment] process, a different result must obtain.
>
> . . . .
>
> With respect to the ... contention that courts should not be burdened with having to evaluate the allegedly disparate impact that an isolated sub-test or question might

have had, we think that [the] concern in that regard is justifiable only in connection with cases that might involve a challenge to a disparate "subscore" that was subsumed in a non-disparate, cumulative overall score. While it is difficult to conceive of how ... a multi-component [employment] process could discriminate in part, but not in the aggregate, without the influence of some affirmative action effort designed to achieve the non-discriminatory overall result, in such a case the multi-component [employment] process would by necessity have to include some internal mechanism that offsets the disparate impact caused by the discriminatory component. [If] *all* of the candidates in such a process [were] afforded the opportunity to receive the benefit of the offsetting mechanism, however, the overall results of the process should be deemed a fair barometer of the fairness of the process.

> Where [an employment] process contains a discriminatory [dispositive] barrier, however, we see little justification for judicial restraint. In the case of [a dispositive] barrier, both the discriminatory component and the affected individuals are readily identifiable. Courts are under an obligation to entertain the claims of individuals who have been victimized by a discriminatory [dispositive] barrier, notwithstanding any belated "corrective" actions taken by the employer.

*Teal v. Connecticut,* 645 F.2d 133, 138–39 (2d Cir.1981) (citation omitted), *aff'd,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).

Plaintiffs argue that despite our discussion in *Teal,* we decided in *Waisome* that a disparate impact claim can be used to challenge a nondispositive step even when the bottom line was nondiscriminatory. In *Waisome,* an employer decided to conduct promotions, and as part of its creation of a promotion list, the employer gave a written exam, an oral exam and a performance appraisal to those employees who were eligible for promotion. *Waisome,* 948 F.2d at 1372. The written exam served two functions: first, each candidate was required to pass it to move on to the subsequent steps of the promotions process; and second, the scores of those candi-

dates who passed the written exam were combined with the candidates scores from the other steps to arrive at a total score that would determine which candidates would be promoted. *Id.* at 1377.

Black candidates received a low average score on the written exam, and sued alleging that the exam had a disparate impact on them. *Id.* at 1373, 1377. We concluded that the black candidates could make a disparate impact challenge to the exam, and that a nondiscriminatory bottom line was no defense to that challenge. Plaintiffs here argue that the written test that we held the plaintiffs could challenge in *Waisome* was a nondispositive step, and that we held that a nondispositive step could be challenged despite a nondiscriminatory bottom line.

However, in *Waisome* we did not hold that the plaintiffs could challenge a nondispositive step. In that case, we held that the plaintiffs could challenge two separate dispositive aspects of the written test: first, that the test excluded candidates from promotion if they failed to receive the official passing score,[5] and second, that the test served as a further dispositive step for those candidates who did not receive a score of 76 (who were then unable to be promoted, no matter how well they performed on the other parts of the promotion tests). *Id.* at 1373, 1377–79. While the test also served as a nondispositive step for those candidates who scored a 76 or higher (those candidates had a chance to be promoted if they did sufficiently well on the other tests), we never held that the plaintiffs could challenge this aspect of the test. Accordingly, we cannot agree that *Waisome* held that a bottom line defense may not be asserted with respect to a nondispositive step.

Plaintiffs have also argued that even if a step must be dispositive to be challenged, the first step here, the Parks Department's decision to cut the Laborer job title in its entirety, was dispositive because it prevented them from receiving any consideration under subsequent steps. However, although the Parks Department decided to eliminate the Laborer job title at the first step, all Laborers did not lose their jobs within the Parks Department. The Laborers were entitled to "bump" employees from other titles who had less seniority, *see* N.Y.Civ.Serv.Law § 80(6) (McKinney 1983), and ten Laborers did bump other employees and thereby retained jobs within the Parks Department. Therefore, even after the Parks Department decided to cut the Laborer job title in its entirety, it is arguable that a second step was still required to determine which Laborers had bumping rights and would therefore be retained; this fact suggests that the Parks Department's decision as to which job titles to cut and how deeply to cut was not a dispositive step. However, the issue is of no consequence. Because we conclude below that the jury instructions were adequate, we do not need to decide whether the first step was dispositive.

In addition to the issue raised by the parties as to whether a step must be dispositive to be challenged, there is at least one other difference between this case and *Teal* which might distinguish *Teal* from this case. In *Teal,* an affirmative action program caused the nondiscriminatory bottom line. In contrast here, the laws of the State of New York, which created steps two and three of the layoff process, caused the nondiscriminatory bottom line. Because this distinction was never discussed below, we do not decide what effect, if any, it would have on this case.

In summary, if plaintiffs had established a *prima facie* case of disparate impact—by establishing that the Parks Department's decision as to which job titles to cut and how deeply to cut had a significant disparate impact on employees age 40 and over—then the nondiscriminatory bottom line was no defense to their claim. *See Teal,* 457 U.S. at 452–56, 102 S.Ct. at 2533–36; *Wards Cove Packing Co.,* 490 U.S. at 653 n. 8, 109 S.Ct. at 2123 n. 8.

### III. *The Jury Charge*

Plaintiffs contend that the district court erred when it refused to instruct the jury that under *Teal,* the nondiscriminatory bot-

---

**5.** While we held that the plaintiffs could make this challenge as a matter of law, we held that the facts of the case did not support such a challenge. *Id.* at 1376.

tom line was no defense. As discussed below, we conclude that the jury instructions were adequate, and therefore affirm.

■ "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994). An instruction must also allow the jury to adequately assess evidence relied on by a party. *Carvel Corp. v. Diversified Mgmt. Group,* 930 F.2d 228, 231–32 (2d Cir.1991). Nevertheless, "we will not upset a judgment because of an error in the jury instructions if the charge actually given was correct and sufficiently covered the essential issues." *Id.* at 231. We review *de novo* a district court's jury instructions. *Anderson,* 17 F.3d at 556.

Here, the district court accurately instructed the jury that for plaintiffs to make a *prima facie* case of disparate impact, plaintiffs had to identify a particular employment practice and show that the practice had a significant disparate impact on employees age 40 and older. The instruction went on to accurately instruct the jury that if the plaintiffs made their *prima facie* case, the Parks Department could show that the challenged practice had a legitimate purpose. Finally, the district court accurately instructed the jury that if the Parks Department established a legitimate purpose, the plaintiffs could show that the proffered purpose was a pretext.

■ On appeal, plaintiffs do not contest that the jury instructions accurately defined the elements of a disparate impact claim. Rather, plaintiffs argue that pursuant to *Teal,* the district court erred when it refused to further instruct the jury that a nondiscriminatory bottom line was no defense to a disparate impact claim.

Plaintiffs contend that the Parks Department implied to the jury that the jury could never find for plaintiffs because of the non-discriminatory bottom line, and therefore, the district court should have instructed the jury on *Teal* to prevent confusion. A review of the Parks Department's statements to the jury reveals this argument to be fallacious.

At closing arguments, the Parks Department stated, in pertinent part:

You heard a lot from two well-known experts.... But what did you learn from those two experts? Plaintiffs' expert ... told you that he attempted to simulate what would happen if the layoffs had occurred in a random fashion. He found the average age of that randomly laid-off group, and he compared that average age to the average age of the people who had actually been affected....

He concluded that the decision that the Parks Department made with respect to which titles to cut and the extent of those cuts had a disparate impact on older workers.

....

[W]hat's wrong with [plaintiffs' expert's] analysis is his so called proxy for seniority, the city hire date. As [the city personnel director] showed you, in many cases, for purposes of seniority, city hire date has absolutely no relationship to seniority for layoffs....

....

I can't tell you what [the correct] calculation would show, but you can guess that it might have made a significant difference....

[The Parks Department's expert], on the other hand, first looked at the proportion of people over 40 in the affected group ... and she compared that number to the proportion of people over 40 in the Parks work force, and she found that in fact older persons were under-represented in the Parks work force [probably intended to be "layoffs"] as a whole. In fact, the Parks work force after the 1991 layoffs was proportionately older than it was before the layoffs.

[The plaintiffs' expert's] response to that is that is not enough, and his theory is that the only way that age discrimination can occur in a system where seniority governs the order of layoffs is by the targeting of older titles.

So [the Parks Department's expert] said, OK, and she did a second analysis to see whether older titles were in fact targeted for layoffs. And what did she find? She

found no evidence that the older titles had been targeted.

We believe these statements would not confuse the jury.

The clear thrust of the Parks Department's argument is that plaintiffs had not established disparate impact because the statistical study offered by plaintiffs was unreliable and because the Parks Department's statistical study showed that titles which predominantly employed workers age 40 and older had not been targeted for layoffs in the first step of the layoff process.

While the Parks Department's argument clearly mentions the nondiscriminatory bottom line, plaintiffs would have made a *prima facie* case of disparate impact if they established that there was a significant disparate impact at the bottom line, *see Wards Cove Packing Co.*, 490 U.S. at 653 & n. 8, 109 S.Ct. at 2122–23 & n. 8. Therefore, it was fair for the Parks Department to comment on the fact that the bottom line was nondiscriminatory. *See id.* More importantly, the Parks Department never implied to the jury that the jury could never find for the plaintiffs if the bottom line was nondiscriminatory. *See Teal*, 457 U.S. at 452–56, 102 S.Ct. at 2533–36. Rather, the Parks Department seemingly acknowledges that a finding that the bottom line was nondiscriminatory was not enough, and that the jury needed to consider the evidence offered by the plaintiffs' expert (which the Parks Department went on to discredit). Rather than confusing the jury as to the relevance of the bottom-line evidence, the Parks Department's argument was a reasonably accurate statement of the law, and we do not believe that it would confuse the jury or require a clarifying or correcting instruction from the court.

 Further, to decide this case, the only thing the jury needed to know was the elements of a disparate impact claim. It has long been held that we assume that a jury follows jury instructions as given. 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2558 at 456–57 (2d ed.1994). Therefore, having been instructed as to the elements of a disparate

impact claim, the jury did not need to be told which issues it did not need to decide, such as which issues were not defenses. *See Carvel Corp.*, 930 F.2d at 231 ("As a general rule, we will not upset a judgment because of an error in jury instructions if the charge actually given was correct and sufficiently covered the essential issues.").

 After all, there are an infinite number of issues that are not defenses. For example, in this case it would not be a defense if the jury thought that the defendants were a nicer group of people than the plaintiffs; it would not be a defense to plaintiffs' age discrimination claim if the defendants did not discriminate on the basis of sex; and it would not be a defense if the plaintiffs did not need their salaries to pay their bills. Certainly, a district court is not required to instruct a jury as to all issues that are not defenses.[6] Rather, the district court needs to instruct the jury only as to applicable law.

This principle was apparently applied in *Treadaway v. Societe Anonyme Louis–Dreyfus*, 894 F.2d 161 (5th Cir.1990). In that case, the plaintiff sued defendant after the plaintiff was injured on a vessel the defendant operated. *Id.* at 162–63. Because the defendant was only the operator of the vessel, the defendant could not be held liable for injuries caused by the vessel being unseaworthy. *Id.* at 163, 165. Instead, the defendant could be held liable only if the defendant was negligent. *Id.* At trial, the district court instructed the jury on negligence, but refused to instruct the jury that defendant could not be found liable if unseaworthiness of the vessel caused the plaintiff's injury. *Id.* at 167. The jury found that the defendant had been negligent and awarded the plaintiff damages. *Id.* at 164.

The defendant appealed, arguing that the district court erred when it refused to instruct the jury on unseaworthiness. *Id.* at 167. The Fifth Circuit held that the instructions were adequate, stating: "[W]e find that the trial judge adequately instructed the jury that the defendant could be found liable *only* if [the defendant] was negligent." *Id.* at 168 (emphasis added). Although never explicitly

---

**6.** Of course, if there are applicable defenses, the jury should be instructed as to them.

stated, the court seemingly reasoned that since the jury had been accurately instructed on the elements of plaintiff's claim, there was no need to instruct the jury on issues that the jury did not need to decide. *See id.* Similarly here, the district court accurately instructed the jury on the elements of plaintiffs' case, and there was no need to instruct the jury on issues that it did not need to decide, such as issues that were not defenses.

In short, the absence of an instruction on a nondefense did not render the instructions inadequate or misleading. *See Anderson*, 17 F.3d at 556. Accordingly, we affirm.

## CONCLUSION

Because the jury instructions were adequate, we affirm.